# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 16, 2008          Decided November 14, 2008

No. 07-7156

BRIDGETTE FEEMSTER, ET AL.,
APPELLEES/CROSS-APPELLANTS

v.

BSA LIMITED PARTNERSHIP,
APPELLANT/CROSS-APPELLEE

Consolidated with 07-7166

Appeals from the United States District Court
for the District of Columbia
(No. 04cv01901)

*Robert E. Greenberg* argued the cause and filed the briefs for appellant/cross-appellee.

*Julie H. Becker* argued the cause for appellees/cross-appellants. With her on the briefs were Barbara McDowell and Clifford J. Zatz. *Eliza T. Platts-Mills* entered an appearance.

Before: GINSBURG, GARLAND, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*:  Current and former tenants in properties owned by BSA Limited Partnership contend that BSA unlawfully refused to accept their federal vouchers as payment for rent, in violation of federal housing statutes and the District of Columbia Human Rights Act.  The district court granted summary judgment for the tenants on the federal claims and for BSA on the Human Rights Act claim.  We affirm the judgment in favor of the tenants but reverse the judgment in favor of BSA.

I

BSA has owned and managed a set of residential properties in northwest Washington, D.C., known as the Bates Street Townhomes, since the early 1980s.  The development contains thirty-seven units spread across thirty buildings on five streets.  From 1982 to 2004, BSA participated in the Section 8 rental assistance program administered by the United States Department of Housing and Urban Development (HUD).[1]  Throughout that period, BSA contractually agreed to limit a tenant's portion of the rent to a percentage of the family's income and to accept the remainder from HUD in the form of a "project-based" subsidy.  HUD also provided BSA with mortgage insurance for the Bates Street Townhomes.  All nine plaintiffs in this case received rental assistance through the

---

[1] "Section 8" refers to Section 8 of the United States Housing Act of 1937, which was added by the Housing and Community Development Act of 1974, Pub. L. No. 93-383, § 201(a), 88 Stat. 633, 662-66 (codified as amended at 42 U.S.C. § 1437f).

Section 8 program. Several have lived in the Bates Street Townhomes for over twenty years.[2]

Following the expiration of its Housing Assistance Payments Contract in 2002, BSA decided to opt out of the Section 8 program. It prepaid its HUD-insured mortgage, sent a one-year notice to tenants on September 30, 2003, and allowed its final contract extension with HUD to expire on September 30, 2004. In the summer of 2004, BSA employees began to encourage -- and then to press -- tenants to vacate their units, offering financial compensation to those who agreed to leave. At the time of its opt-out, BSA had arranged to sell the Bates Street Townhomes to a third-party developer. Although the initial deal fell through, BSA continued its efforts to sell the properties and in 2005 found a new buyer, TMS Investments, LLC. The contract with TMS expressly conditioned the purchase of individual units on their being vacant at the time of closing. BSA has not accepted new tenants at the Bates Street Townhomes since January 2003.

Under federal law, when an owner opts out of a project-based Section 8 contract, assisted families in that project may elect to remain in their units and receive "enhanced vouchers." *See* 42 U.S.C. § 1437f(t). With such a voucher, the tenant's rent subsidy may be "enhanced" (pursuant to a formula) to cover the difference between the previous rent and the new market rent. *Id.* Alluding to the enhanced voucher provision, BSA's opt-out letter to its tenants stated:

---

[2] BSA did not dispute the tenants' statement of facts in the district court, *see Feemster v. BSA Ltd. P'ship*, 471 F. Supp. 2d 87, 88 n.2 (D.D.C. 2007), nor does it here. We therefore follow the district court in treating their factual assertions as conceded.

> Federal law allows you to elect to continue living at this property provided that the unit, the rent, and we, the owners, meet the requirements of the Section 8 tenant-based assistance program. As an Owner, we will honor your right as a tenant to remain at the property on this basis as long as it continues to be offered as rental housing, provided that there is no cause for eviction under Federal, State or local law.

J.A. 670.

In conjunction with BSA's opt-out, the District of Columbia Housing Authority (DCHA), which administers the Section 8 program in the District, determined that the tenants were eligible for enhanced vouchers. When tenants tried to use their vouchers for rental payments, however, BSA refused to accept them or to execute the necessary lease agreements. Starting in September 2004, BSA wrote letters to the tenants declaring that it would not sign the paperwork required for use of the vouchers, but stating that, "provided you pay the rent charged and otherwise abide by the terms of your tenancy, you may continue to reside in the property which you currently lease until such time as [you] may be required to vacate upon appropriate notice." J.A. 673-78. Each letter specified the "current rent" for that tenant's unit. *Id.* Thereafter, the tenants "continued to pay rent each month to BSA, either at the full market amount or at the [lower] amount established by the project-based Section 8 program." J.A. 594 (Plaintiffs' Statement of Material Facts Not in Dispute ¶ 15).

On November 2, 2004, the tenants filed their initial complaint in this action, together with an application for a temporary restraining order (TRO). The district court granted a TRO two days later, requiring BSA "to initiate the process of accepting [the tenants'] enhanced vouchers, to wit: immediately

sign, complete, and submit any necessary papers to the District of Columbia Housing Authority to begin the 'lease-up' process so that [the tenants] will be able to use their enhanced vouchers at their current homes." *Feemster v. BSA Ltd. P'ship*, No. 04-1901, TRO at 2 (D.D.C. Nov. 4, 2004). BSA initiated the lease-up process with DCHA as ordered, but refused to complete the paperwork that DCHA required to pay the rent subsidy on behalf of the tenants.

Shortly after the court issued the TRO, BSA offered the tenants the opportunity to buy their homes, in accordance with the District of Columbia's Tenant Opportunity to Purchase Act, D.C. Code § 42-3404.02 *et seq*. With assistance from a local nonprofit housing developer, four tenants negotiated contracts for sale. On the day before closing, BSA informed the tenants that it would not complete the sales unless they reimbursed it for approximately $37,000 in rent they allegedly had not paid since the commencement of the litigation -- rent that would have been covered by the enhanced vouchers had BSA been willing to accept them. To allow the sales to go forward, the district court facilitated an arrangement under which the tenants agreed to place the disputed sum in an escrow account administered by a settlement attorney.[3]

---

[3] The four plaintiffs who purchased their homes were Mary Brown, Beatrice Harris, Shirley Holland, and Dyanne Johnson. *See Feemster v. BSA Ltd. P'ship*, No. 04-1901, Joint Status Report ¶ 1 (D.D.C. June 30, 2006). The lead plaintiff, Bridgette Feemster, did not purchase her unit and moved out of the Bates Street Townhomes in February 2006. *Id.* ¶ 2. Plaintiffs Michelle Hawkins, Lillian Johnson, Sabrina Lymore, and Dorothy Paul still reside in their units as tenants. In light of these developments, the plaintiffs conceded that the injunctive claims were moot with respect to Feemster and the four homebuyers, but continued to press their damages claims. *Id.* ¶¶ 1-2.

In January 2005, BSA served the remaining tenants with 180-day eviction notices.  When the tenants refused to move out at the end of the 180 days, BSA brought an action to evict them in District of Columbia Superior Court.  On August 28, 2007, the Superior Court ruled that BSA's eviction notices were "inadequate as a matter of law" and that the tenants were entitled to remain in their units.  *Hawkins v. BSA Ltd. P'ship*, No. 04-6839, Order at 4 (D.C. Sup. Ct. Aug. 28, 2007).  BSA has filed an appeal from that judgment in the District of Columbia Court of Appeals, where it is currently pending.

In their U.S. District Court complaint, the tenants argued that BSA was required to accept their enhanced vouchers until their tenancies were validly terminated under District of Columbia law, and that its refusal to do so violated both federal housing statutes and the District of Columbia Human Rights Act.  On January 12, 2007, the district court granted summary judgment for the plaintiffs on their federal claims, finding it "clear that 'families renting at the time of the termination of [a] project-based subsidy contract [have] the right to remain in their units, using enhanced vouchers, for so long as the tenant remains eligible for the vouchers or until the tenant is evicted.'" *Feemster v. BSA Ltd. P'ship*, 471 F. Supp. 2d 87, 98 (D.D.C. 2007) (quoting *Jeanty v. Shore Terrace Realty Ass'n*, No. 03-8669, 2004 WL 1794496, at *3 (S.D.N.Y. Aug. 10, 2004)).  On the D.C. Human Rights Act claim, however, the district court granted summary judgment in favor of BSA, finding that the plaintiffs failed to show "that an impermissible factor played a motivating or substantial role" in BSA's refusal to accept their enhanced vouchers.  *Id.* at 102.

BSA now appeals the district court's grant of summary judgment in favor of the tenants on the federal housing law claims.  The tenants cross-appeal the court's grant of summary judgment in favor of BSA on the D.C. Human Rights Act

claim.[4]   We review grants of summary judgment de novo. *Waterhouse v. District of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002).   Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).

## II

The United States Housing Act of 1937, as amended by the Multifamily Assisted Housing Reform and Affordability Act of 1997 and subsequent legislation, gives a family that receives an enhanced voucher the right to "elect to remain in the same project in which the family was residing on the date" that the project owner's Section 8 contract expires.   42 U.S.C. § 1437f(t)(1)(B).[5]  BSA does not dispute that § 1437f(t) gives tenants the right to remain in their units despite an opt-out; it does not dispute that, under appropriate circumstances, an

---

[4] The tenants' complaint also alleged that BSA's actions violated the District of Columbia Consumer Protection Procedures Act, D.C. Code § 28-3901 *et seq.*  Second Am. Compl. ¶¶ 94-96.  The district court granted summary judgment to BSA on this claim, and the tenants do not pursue it on appeal.

[5] Additional statutory and regulatory provisions echo § 1437f(t)'s right-to-remain language. *See* 42 U.S.C. § 1437f(c)(8)(A) (requiring owners' opt-out notices to "include a statement that . . . in the event of termination [HUD] will provide tenant-based rental assistance to all eligible residents, enabling them to choose the place they wish to rent, which is likely to include the dwelling unit in which they currently reside"); 24 C.F.R. § 402.8(c) (2006) ("In the case where a contract for Section 8 rental assistance for a project is terminated or expires, an assisted family may elect to remain in the project and, if eligible, receive tenant-based Section 8 assistance under Section 8(t) of the United States Housing Act of 1937.").

opting-out project owner must permit its tenants to use enhanced vouchers for rental payments; and it does not dispute that the tenants may sue to enforce their § 1437f(t) rights in federal court. "This is a single issue case," BSA informs us, and that issue is whether its units were being "offered for rental housing" at the time it refused the tenants' enhanced vouchers. Appellant's Br. 7; *see* Oral Arg. Recording at 10:48.

According to BSA, tenants have the right to remain in their units, and landlords have a corresponding obligation to accept the tenants' enhanced vouchers, only as long as the units are "offered for rental housing." Moreover, whether a unit is offered for rental housing is a question of the landlord's subjective intent. Because BSA seeks to exit the rental business -- because it wants to offer its units for sale rather than for rent -- BSA maintains that it is not "offer[ing]" its units for rental housing.

The caveat upon which BSA rests its entire appeal -- that a tenant's right to remain is "conditioned on the unit[] being 'offered for rental housing,'" Appellant's Reply Br. 9 -- does not appear in § 1437f(t). Nor does it appear anywhere else in the U.S. Housing Act or in any other statute or regulation. Instead, it appears in a sentence in a HUD policy guide that describes the right-to-remain provision. *See* OFFICE OF MULTIFAMILY HOUS., U.S. DEP'T OF HOUS. & URBAN DEV., SECTION 8 RENEWAL POLICY § 11-3.B (2001) [hereinafter Policy Guide]. The sentence in question reads as follows: "Tenants who receive an enhanced voucher have the right to remain in their units *as long as the units are offered for rental housing . . . .*" *Id.* (emphasis added).

The degree of deference that we owe to such a policy guide is uncertain. *See United States v. Mead Corp.*, 533 U.S. 218, 234-35 (2001); *see also Federal Express Corp. v. Holowecki*,

128 S. Ct. 1147, 1156 (2008); *Public Citizen, Inc. v. U.S. Dep't of Health & Human Servs.*, 332 F.3d 654, 660 (D.C. Cir. 2003). At the least, it is "eligible to claim respect according to its persuasiveness." *Mead*, 533 U.S. at 221 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)). But even if we were to accord the policy guide the full measure of deference dictated by *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), under which we will uphold an agency's reasonable interpretation of ambiguous statutory language, it would not help BSA's case.

It does seem reasonable that the statutory right "to remain in the same project in which the family was residing," 42 U.S.C. § 1437f(t)(1)(B), applies only as long as the property itself remains a rental property. The plaintiffs do not dispute this point. They acknowledge that, if and when BSA lawfully terminates their tenancies under D.C. law, "nothing in the enhanced voucher rules will stand in its way" should BSA then decide to refuse their vouchers and evict them. Appellees' Br. 17. What the tenants dispute is BSA's contention that their right to remain in their homes -- and their concomitant right not to be regarded as in default merely because they tendered vouchers rather than cash -- depends on the subjective intent of the project owner. In the tenants' view, whether a unit remains a rental property is determined by the law of the local jurisdiction. And as of this date, the District of Columbia courts have determined that the tenants have the right to continued occupancy.

The language BSA quotes from the policy guide -- that the tenants have the right to remain "as long as the units are offered for rental housing" -- is ambiguous. It could, as BSA asserts, be read to condition a tenant's right to remain on the landlord's intent rather than on the law of the jurisdiction. In context, however, it is clear that this is not what HUD meant in using the words "are offered." Indeed, the very next sentence of the

10

policy guide reflects the view of the plaintiffs in this case: "Owners may not terminate the tenancy of a tenant who exercises this right to remain except for cause under Federal, State or local law." Policy Guide § 11-3.B. Elsewhere in the same policy guide, HUD requires owners to certify "that they will comply with the requirement to allow families receiving enhanced vouchers who elect to remain to do so *as long as the property remains a rental property*, unless the owner has just cause for eviction," *id.* § 1-6.I (emphasis added), and to "agree not to terminate the tenancy of a tenant who exercises [his or her] right to remain, except for cause under State or local law," *id.* Attachment 3A-1, at 6. A contemporaneous HUD "Policy and Processing Guidance" concerning Section 8 opt-outs contains similar language: "A family that receives an enhanced voucher has the right to remain in the project *as long as the units are used for rental housing* and are otherwise eligible for housing choice voucher assistance . . . . The owner may not terminate the tenancy of a family that exercises its right to remain except for a serious or repeated lease violation or other good cause." OFFICE OF PUB. & INDIAN HOUS., U.S. DEP'T OF HOUS. & URBAN DEV., NOTICE PIH 2001-41, § II.B, at 26 (2001) (emphasis added).

HUD's publications thus use the phrase "offered for rental housing" as synonymous with "remains a rental property" and "used for rental housing." Moreover, in each case the phrases are coupled with a prohibition on terminating the tenancies without cause. There is no reference at all to the landlord's intent. Taken together, HUD's statements make clear that it considers a property to be "offered for rental housing" until it is withdrawn from rental use in accordance with the law of the local jurisdiction. *Accord Jeanty*, 2004 WL 1794496, at \*4 ("HUD has interpreted 42 U.S.C. § 1437f to mean that families who receive enhanced vouchers have the right to remain, and that a landlord *must* accept their enhanced vouchers unless the

landlord evicts them through the court system." (citing the HUD Policy Guide)). This is an objective inquiry tied to the legal status of the property, not to the owner's intentions. In light of the statute's plain text, its anti-displacement purpose, and HUD's reasonable and persuasive interpretation, the district court correctly determined that the tenants' right under § 1437f(t) to remain in their homes, and to pay their rent with enhanced vouchers, is secure unless and until their tenancies are validly terminated under D.C. law.

BSA protests that this interpretation of the statute will ensnare landlords in an "endless lease." Appellant's Br. 12. That is simply not the case. Neither the U.S. Housing Act nor HUD's interpretation of that Act bars landlords from terminating a tenancy on any ground permitted by D.C. law. One thing that BSA may not do, however, is refuse to accept payment by voucher and then contend that eviction is warranted for nonpayment of rent.[6]

## III

The District of Columbia Human Rights Act makes it unlawful to refuse to "conduct any transaction in real property," to "require different terms for such transaction," or to "include in the terms or conditions of a transaction in real property" any

---

[6] In addition to their U.S. Housing Act claim, the tenants' complaint also alleged, and the district court held, that BSA's actions violated the National Housing Act, which instructs the Secretary of HUD to assure that Section 8 "project owners not interfere with the efforts of tenants to obtain rent subsidies or other public assistance." 12 U.S.C. § 1715z-1b(b)(2). Because the parties did not brief this issue on appeal and do not suggest that violation of this statute yields a remedy any different from violation of 42 U.S.C. § 1437f(t)(1)(B), we have no need to consider it.

condition or restriction "wholly or partially for a discriminatory reason based on" any of a list of specified factors, including an individual's "source of income." D.C. Code § 2-1402.21(a)(1), (2). The Act expressly provides that monetary assistance "under section 8 of the United States Housing Act . . . shall be considered a source of income under this section." *Id.* § 2-1402.21(e). Aggrieved persons have a cause of action for damages and other remedies in any court of competent jurisdiction. *Id.* § 2-1403.16.

The tenants do not dispute that, during the time in which they "remained in their units -- while their challenge to BSA's eviction claim was pending in the local D.C. courts -- they were liable for monthly rent payments." Appellees' Reply Br. 1. Nor does BSA dispute that, during this same period, it demanded that the tenants pay rent from their own funds and not through the Section 8 voucher program. BSA insists that this was not "source of income" discrimination, however, because it was not motivated by animus against vouchers or their users but rather by "a desire to vacate the units so it could sell them." Appellant's Reply Br. 8. The district court accepted BSA's argument that motive was dispositive. Applying what it described as a "mixed motive" analysis, *Feemster*, 471 F. Supp. 2d at 100-01, the court concluded that "plaintiffs have not established a *prima facie* case of discrimination under the [Human Rights Act] because they have not shown that an impermissible factor played a motivating or substantial role in the action [BSA] has or has not taken; namely, that BSA refused to accept the plaintiffs' enhanced vouchers because their source of income was the tenant-based Section 8 program," *id.* at 102-03.

The district court erred in resolving this case based on its assessment of BSA's motive. Although the District of Columbia Court of Appeals has not yet "outlined the boundaries of source-

of-income discrimination under the Human Rights Act," *Blodgett v. University Club*, 930 A.2d 210, 220 (D.C. 2007), in interpreting that Act it has "'generally looked to cases from the federal courts involving claims brought under [Title VII of] the Civil Rights Act of 1964 for guidance,'" *Nicola v. Washington Times Corp.*, 947 A.2d 1164, 1171 (D.C. 2008) (quoting *Benefits Commc'n Corp. v. Klieforth*, 642 A.2d 1299, 1301 (D.C. 1994)). And under Title VII, when a policy is "discriminatory on its face," the defendant's motive is irrelevant. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985); *see Automobile Workers v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991) ("[T]he absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect. Whether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination."); *see also Los Angeles Dep't of Water & Power v. Manhart*, 435 U.S. 702, 716-17 (1978) (holding that an employer's policy requiring female employees to make larger pension fund contributions than male employees was discriminatory on its face in violation of Title VII).

Since September 2004, BSA has refused to accept Section 8 voucher payments from its tenants, while demanding and accepting rent from the tenants' own funds. Just as it would constitute a facial violation of Title VII to discriminate in leasing on the basis of a renter's race -- regardless of whether the landlord professed a "benign" motive for so doing -- it is a facial violation of the Human Rights Act to discriminate on the basis of the renter's source of income. Although BSA claims that it only demanded cash because it had "a right to be paid for the use of its property" while the tenants remained in their units, Appellant's Reply Br. 12, this does not explain why BSA agreed to accept payment in cash and not in vouchers.

The only rationale BSA has suggested for its policy is that it did not want to accept vouchers because the voucher program's requirements are burdensome, particularly the requirement that the landlord execute an initial lease or ratification with the tenant. *See, e.g.*, Oral Arg. Recording at 5:12-25. Were we to accept that excuse, however, we would render the Human Rights Act's definition of "source of income" nugatory. The Act expressly defines "source of income" as encompassing the Section 8 program; indeed, Section 8 vouchers are the source-of-income provision's paradigm case. *See* D.C. Code § 2-1402.21(e). Permitting BSA to refuse to accept Section 8 vouchers on the ground that it does not wish to comply with Section 8's requirements would vitiate that definition and the legal safeguard it was intended to provide.

Because the material facts are uncontested, and because they make out a facial violation of the District of Columbia Human Rights Act, we reverse the district court's grant of summary judgment in favor of BSA and remand for a determination of appropriate relief.

## IV

For the foregoing reasons, we conclude that the tenants are entitled to judgment as a matter of law on both their United States Housing Act claim and their District of Columbia Human Rights Act claim. The district court's grant of summary judgment in their favor on the former is affirmed. Its grant of summary judgment against the tenants on the latter is reversed, and the case is remanded for further proceedings consistent with this opinion.