W. FLETCHER, Circuit Judge,
concurring in part and dissenting in part:
I agree with the majority that 42 U.S.C. § 1437f(t) confers on tenants the right to remain in their homes and precludes owners from charging tenants more in rent than the contribution prescribed by the Section 8 statute and applicable regulations. I therefore concur in those portions of the majority’s opinion so holding.
I respectfully dissent from the majority’s holding that Defendants have no obligation to enter into HAP contracts with the local public housing authority (“PHA”). The majority’s discussion of the appropriateness of injunctive relief is a red herring. The critical issue is whether the Defendants have an obligation to enter into those contracts, irrespective of how that obligation is enforced. The majority holds that Defendants have no obligation to enter into HAP contracts. I would hold that they do have such an obligation.
The majority holds, correctly, that § 1437f(t) gives Section 8 tenants a “right to remain” in their subsidized apartments after the transition to the enhanced voucher program. But the majority fails to recognize the extent of that right. Under the enhanced voucher program, Defendants have the right to raise the total rent on apartments to fair market value. In return, tenants have the right to remain in their apartments. The tenants’ right to remain is a practical, common-sense right. It is a statutory right to remain in their apartments while paying the same amount of out-of-pocket rent as before. The enhanced vouchers implement this part of the right. It is also a statutory right to remain in their apartments while enjoying the same level of maintenance and service as before. The HAP contracts implement this part of the right.
Section § 1437f(t) was enacted to protect the “particularly vulnerable populations” of low-income, elderly, and disabled persons who occupy former Section 8 projects. See Estevez v. Cosmopolitan Assocs., No. 05CR-4318, 2005 WL 3164146, at *5 (E.D.N.Y. Nov.28, 2005) (quoting Section 8 Housing: Hearing before the Subcomm. on Hous. & Transp. of the S. Banking Comm., 106th Cong. (1999) (writ *1164 ten testimony of Rep. Rick Lazio)). HAP contracts play a central role in the statutory scheme. HAP contracts prescribe, and enable PHAs to enforce, the conditions of public housing that Congress thought essential to the statutory purpose of providing the poor not only an affordable but also “a decent place to live.” § 1437f(a). See also id. § 1437(a)(1)(A) (“It is the policy of the United States ... to assist States and political subdivisions of States to remedy the unsafe housing conditions and the acute shortage of decent and safe dwellings for low-income families.... ”). By countenancing enhanced voucher tenancies in the absence of a HAP contract, the majority creates a situation never contemplated by Congress.
Owners who do not enter into HAP contracts cannot redeem enhanced vouchers. See 24 C.F.R. § 982.305(c)(2); Guide at 11-3B. HUD regulations treat housing assistance payments and HAP contracts as symbiotic. See id. § 982.309(b)(2)(iii) (“The HAP contract terminates if ... the PHA terminates assistance for the family.”); id. § 982.311(c)(2) (“Housing assistance payments terminate if ... the HAP contract terminates.”). Those courts that have held that § 1437f(t)(l)(B) creates a right to remain using enhanced vouchers have therefore also required the execution of HAP contracts so that tenants may apply enhanced vouchers to pay their increased rents. See, e.g., Feemster v. BSA Ltd. P’ship, 548 F.3d 1063, 1069 (D.C.Cir.2008), aff'g in relevant part, 471 F.Supp.2d 87, 92, 97 (D.D.C.2007); Barrientos v. 1801-1825 Morton, LLC, No. 06-6437, 2007 WL 7213974, at *6 (C.D.Cal. Sept. 11, 2007), aff'd on other grounds, 583 F.3d 1197 (9th Cir.2009); Jeanty v. Shore Terrace Realty Ass’n, No. 03CIV-8669, 2004 WL 1794496, at *3 (S.D.N.Y. Aug. 10, 2004). But see Estevez, 2005 WL 3164146, at *7 (stating, in dicta, that owner who agrees to accept as full payment of rent a tenant’s statutorily prescribed contribution, thereby forgoing any money from enhanced vouchers, “remains free to refuse to sign contracts with [the PHA] and thereby to forfeit any rental income above and beyond the direct payments made by tenants”).
The text of the Section 8 statute nowhere explicitly requires an owner to enter into a HAP contract, but the statute clearly contemplates that the owner will do so. See, e.g., § 1437f(c)-(d) (required terms of HAP contract); 1437f(o)(7) (required terms of owner-tenant lease governed by HAP contract); 1437f(o)(8)(A) (inspection of units covered by HAP contract for compliance with HUD’s housing quality standards). A HAP contract does more than merely to authorize tenants to use enhanced vouchers to satisfy part of their rent obligations, and to authorize owners to redeem those vouchers. HAP contracts prescribe minimum housing quality standards, requiring owners to provide such things as adequate heat and hot water, lighting, air quality, sanitary conditions, and building security. 42 U.S.C. § 1437f(o)(8)(B); 24 C.F.R. § 982.401. They protect tenants who are the victims of domestic violence from being evicted for that reason. 42 U.S.C. § 1437f(d)(l)(B)(ii), (o)(7)(C). HAP contracts also give owners and law enforcement officers latitude to make housing projects safer places. They allow owners to evict occupants for drug-related or criminal activity that threatens the health and security of other tenants and require that law enforcement officers be provided access to common areas if they have probable cause to believe criminal activity is occurring there. See § 1437f(d)(l)(B)(iii), (d)(6), (g)(7)(D).
Recognizing that low-income tenants might lack the ability to assert their right to “a decent place to live” against owners, Congress made PHAs responsible for enforcing compliance with HAP contracts. *1165 The statutory structure thus assigns HAP contracts a dual role: they prescribe liveable conditions for housing projects, and they enable PHAs to enforce compliance with those conditions. See, e.g., 42 U.S.C. § 1437f(o)(8)(A), (C)-(D); 24 C.F.R. § 982.405 (PHA inspections to ensure compliance with housing quality standards); id. § 982.404(a)(2) (PHA required to take “prompt and vigorous action” to enforce housing quality standards; PHA remedies for noncompliance include suspension or reduction of housing assistance payments and termination of HAP contract); id. § 982.453(b) (PHA remedies for any breach of HAP contract include reduction or termination of housing assistance payments and termination of HAP contract).
No owner would participate in the Section 8 program unless he could collect rent, and no owner could collect anything close to the amount of rent to which he is entitled unless he also entered a HAP contract. Hence the strangeness of Defendants’ argument.
By proposing to forgo enhanced voucher payments, Defendants propose to incur a substantial financial loss. The fifteen individual plaintiffs in this suit allege in their complaint that they pay between $159.00 and $550.00 per month in rent out of their own pockets, for a total of about $5,000 monthly or $60,000 annually. HUD has set the fair market rent for a one-bedroom apartment in Oakland much higher, at $1,176 per month. See Final Fair Market Rents for Fiscal Year 2011 for the Housing Choice Voucher Program and Moderate Rehabilitation Single Room Occupancy Program, 75 Fed. Reg. 61254, 61263 (Oct. 4, 2010). See also 42 U.S.C. § 1437f(c)(1)(B); 24 C.F.R. §§ 888.113, 982.503. Fair market rent for fifteen one-bedroom apartments thus totals $17,640 monthly or $211,680 annually. Defendants would leave approximately $150,000 in annual rental income on the table by declining to enter the HAP contracts covering the plaintiffs in this case. The true figure at stake may be much greater because defendants would forgo enhanced voucher payments from all of the Park Village tenants under the program, not just the individual plaintiffs in this suit.
I assume that Defendants are not trying to commit economic suicide. If that is so, they must somehow compensate for this loss of income. They may do so by failing to maintain and service plaintiffs’ living units in compliance with HUD’s housing quality standards. They may also seek to recoup some of their loss by renewing their efforts to empty Park Village of its population of elderly, fixed-income Section 8 tenants. Only such cost-saving measures action make any economic sense, especially because, as the district court observed, defendants “could identify no specific terms in the HAP contract which were objectionable.”
There is thus a significant likelihood that if owners escape the obligation to enter into HAP contracts by refusing to accept enhanced vouchers, they will take steps to defeat the tenants’ right to remain. Without the ability to insist that the Defendants provide “a decent place to live,” the “right to remain” guaranteed by § 1437f(t) would become illusory.