OPINION OF THE COURT FISHER, Circuit Judge. In this appeal, we must decide whether the enhanced voucher provision of the United States Housing Act of 1937, 42 U.S.C. § 1437f(t), requires property owners to continuously renew enhanced-voucher tenancies. Theodore Hayes and Aqeela Fogle (the Hayes family) are a low-income family whose rent is subsidized by enhanced voucher assistance. Their eligibility to receive enhanced vouchers is contingent upon their continued tenancy in a unit currently owned by Philip E. Harvey. Toward the end of their most recent lease term, Harvey notified the Hayes family that he would not renew their lease. The Hayes family refused to vacate the premises, arguing that as enhanced-voucher tenants, they have an enforceable “right to remain” in their unit as long as it is offered for rental housing. The District Court disagreed and granted Harvey’s motion for summary judgment. Because we conclude that the enhanced voucher provision does not obligate property owners to renew enhanced-voucher tenancies after the initial lease term, we will affirm. I. Background A. Statutory Background Since 1974, the federal government has provided rental assistance to low-income families through section 8 of the Housing Act, 42 U.S.C. § 1437f. Congress enacted section 8 with the express purpose of “aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing.” § 1437f(a). “[A] key means to that end is the creation of incentives for private owners to participate in the section 8 program.” Barrientos v. 1801-1825 Morton LLC, 583 F.3d 1197, 1203 (9th Cir. 2009). Section 8 assistance is funded by the U.S. Department of Housing and Urban Development (HUD) and administered by local public housing agencies. 24 C.F.R. § 982.1(b)(1). Those agencies enter into Housing Assistance Payment (HAP) contracts with participating property owners. HAP contracts generally require that a lease between a property owner and tenant cover at least one year. 42 U.S.C. § 1437f(d)(1)(B)(i), (o)(7)(A). They also prohibit the property owner from “termi-nat[ing] the tenancy [during the term of the lease] except for serious or repeated violation of the terms and conditions of the lease, for violation of applicable Federal, State, or local law, or for other good cause.” § 1437f(d)(l)(B)(ii), (g)(7)(C). Importantly, HAP contracts establish the maximum monthly rent a property owner may charge for each dwelling unit. § 1437f(c)(l)(A). A tenant’s assistance is statutorily determined based on his or her household income, the unit’s rent, and the rent for similar units in the market area (known as the payment standard). § 1437f(c)(3), (o)(2). There are two distinct assistance programs: project-based assistance and tenant-based assistance (or the Housing Choice Voucher program). Project-based assistance is provided directly to property owners—the subsidies are property-specific. Tenant-based assistance is provided directly to tenants—the subsidies are tenant-specific. In the 1990s property owners became eligible to opt out of project-based assistance programs. Congress and HUD sought to minimize tenant displacement, while also continuing to encourage property owner participation in section 8 programs. See Barrientos, 583 F.3d at 1203-05. So Congress enacted a notice requirement that prohibits a property owner from increasing rent or evicting tenants until he or she provides one year of written notice to HUD and the residing tenants that the HAP contract for project-based assistance will not be renewed. See § 1437f(c)(8). And the notice must inform tenants that “in the event of termination [HUD] will provide tenant-based rental assistance to all eligible residents, enabling them to choose the place they wish to rent, which is likely to include the dwelling unit in which they currently reside.” § 1437f(c)(8)(A). But an ordinary voucher under tenant-based assistance does not cover a tenant’s rent to the extent that it exceeds the applicable payment standard. § 1437f(o)(2)(B). And following a valid opt-out, property owners are no longer subject to limitations on what they may charge for rent. So to enable residents to “choose” to continue renting the “dwelling unit in which they currently reside,” § 1437f(c)(8)(A), Congress also enacted a new type of tenant-based assistance: enhanced voucher assistance, § 1437f(t). Although it is a type of tenant-based assistance, enhanced voucher assistance has elements of both project-based and tenant-based assistance. Like tenant-based assistance, enhanced voucher assistance is tenant-specific and participating tenants are required to contribute a statutorily determined portion of their income. Compare § 1437f(o)(2) (ordinary voucher assistance), with § 1437f(t)(1) (enhanced voucher assistance). Like project-based assistance, enhanced voucher assistance is property-specific. § 1437f(t)(1)(B). Tenants are eligible to receive enhanced voucher assistance during any period in which they remain in the property they resided in on the date of the property owner’s opt-out from a project-based program (the “eligibility event”). § 1437f(t)(2). Should the tenant move or make the voucher available to another family, his or her assistance converts to ordinary tenant-based assistance. § 1473f(t)(1)(C). The primary “enhancement” of the assistance is that an enhanced voucher covers the difference between the tenant’s contribution and the rent, even if the rent exceeds 110 percent of the fair market rent for similar units in the area. See § 1437f(t)(1)(B). In other words, enhanced voucher assistance is not limited by a payment standard. B. Factual Background In 1982, Florence Hayes and her family moved into 538B Pine Street, Philadelphia, Pennsylvania—a four-bedroom unit in a duplex owned by Pine Street Associates. Pine Street Associates entered into a HAP contract with the Philadelphia Housing Authority (PHA), which provided rental assistance under a project-based program for its tenants, including the Hayes family. On January 9, 2008, Pine Street Associates notified HUD and the Hayes family that when its HAP contract expired on January 17, 2009, it would not be renewed. Accordingly, on January 17, 2009, the Hayes family’s assistance converted from project-based to tenant-based. The Hayes family elected to remain and chose to do so with enhanced voucher assistance. Later that year, Pine Street Associates sold 538 Pine Street free and clear of any impediments, encumbrances, liens, or restrictions, to Philip E. Harvey. Harvey entered into a HAP contract with the PHA and a related lease with the Hayes family, agreeing to accept enhanced vouchers toward their rental obligations. The HAP contract set the maximum rent for the unit at $2,400 per month, exceeding the applicable payment standard of $1,546 per month by $854. While under the ordinary voucher provision the Hayes family would have to cover the rent to the extent that it exceeded $1,546, because they were eligible for enhanced voucher assistance, the PHA covered the $854 difference. The lease had an initial termination date of April 30, 2011, subject to automatic renewal for another one-year term. In February 2015, Florence Hayes passed away and Theodore Hayes (Florence. Hayes’s son) was processed as head of household.- Soon after, Harvey notified the PHA and Theodore Hayes that he. would not renew the HAP contract or the Hayes family’s lease upon the natural expiration, of the lease term, citing Florence Hayes’s passing and his desire to renovate and have his daughter live in the unit. And on May 1, 2015, when that lease term expired, Harvey sent a notice to vacate. C. Procedural History The Hayes family responded to the notice to vacate by filing a complaint in the District Court seeking declaratory relief and an order enjoining Harvey from initiating eviction proceedings. They argued in the District Court, and maintain on appeal, that the Housing Act’s enhanced voucher provision, 42 U.S.C. § 1487f(t), creates an enforceable right to remain in their "unit. Alternatively, they argued that if Harvey may termiriate their tenancy, he may only do so for “cause,” and his stated reasons do not constitute good cause. Harvey responded that because he never participated in a project-based program, he is bound only by the terms of the HAP contract and related lease and not subject to any additional requirements imposed by section 8. The parties filed cross motions for summary judgment. The District Court granted summary judgment in favor of Harvey, denied the Hayes family’s motion for summary judgment, and denied their motion for a preliminary injunction as moot. 186 F.Supp.3d 427 (E.D. Pa. 2016). The court concluded that while Harvey was subject to the terms of section 8, the enhanced voucher provision did not provide the Hayes family an “unfettered and perpetual right to remain,” and so Harvey was not precluded from termination. Id. at 433-34. The Hayes family appealed and, pending this appeal, the District Court granted an injunction preventing Harvey from evicting the Hayes family. II, Jurisdiction and Standard of Review The District Court had jurisdiction under 28 U.S.C. § 1331. During the pendency of this appeal, Theodore Hayes moved out of the premises and the PHA processed Aqeela Fogle (Theodore Hayes’s niece) as the head of household. Under Article III of the Constitution, our “exercise of judicial power depends upon the existence of a case or controversy.” Rendell v. Rumsfeld, 484 F.03d 236, 240 (3d Cir. 2007) (quoting Intn’l Bhd. of Boilermakers v. Kelly, 815 F.2d 912, 914 (3d Cir. 1987)). “Article III demands that an actual controversy persist throughout all stages of litigation.” Hollingsworth v. Perry, — U.S. —, 133 S.Ct. 2652, 2661, 186 L.Ed.2d 768 (2013) (internal quotation marks omitted). When evaluating mootness we ask “whether changes in circumstances that prevailed at the beginning of the litigation have forestalled any occasion, for meaningful relief.” Rendell, 484 F.3d at 240 (internal quotation marks omitted). Because Theodore Hayes no longer resides -in the unit, he does not have a personal stake in the outcome of this suit and we do not have jurisdiction to hear his claims. However, since Fogle still resides in the unit and, until she moves, is eligible for enhanced voucher assistance, there remains an occasion for meaningful relief. Thus, we are satisfied that the case remains a justiciable controversy under Article III. Our jurisdiction exists under 28 U.S.C. § 1291. Our review of the District Court’s order granting summary judgment is de novo. Massie v. U.S. Dept. of Hous. & Urban Dev., 620 F.3d 340, 347 (3d Cir. 2010). We will affirm if, viewing the evidence in the light most favorable to the nonmoving party, “there is no genuine dispute as to any material fact and the mov-ant is entitled to judgment as a matter of law.” Fed. R. Civ. P, 66(a). III. Discussion The Hayes family argues that, as enhanced-voucher tenants, they have a right to remain in unit 538B because they have not moved since the unit was converted from project-based to tenant-based assistance, they have not provided the voucher to another family, the property continues to be offered as rental housing, and Harvey does not have cause to terminate their tenancy. Unless and until any of the above circumstances change, they assert Harvey must continually renew their lease. Harvey, on the other hand, argues that because he purchased the property “free and clear,” he is not subject to section 8’s. terms and conditions and is under no obligation to renew their lease. We conclude that the manner in which Harvey purchased the property is not dispositive. Harvey’s rights and duties under the seer tion 8 program are set forth in the HAP contract and related lease.[1] However, for the reasons that follow, we conclude that federal law does not impose on property owners a requirement of cause to terminate enhanced-voucher tenancies through nonrenewal. This appeal presents an issue of statutory interpretation, so we' start with an examination of the statute’s plain language. See Rosenberg v. XM Ventures, 274 F.3d 137, 141 (3d Cir. 2001). If the statutory language is unambiguous, and the “literal application of the statute” will not “produce a resúlt [either] demonstrably at odds with the intentions of its drafters” or “so bizarre that' Congress could not have intended it,” we need not consider the statutory purpose or legislative history. Doe v. Hesketh, 828 F.3d 159, 167 (3d Cir. 2016) (internal quotation marks omitted). A. The Opt-out Provision We begin with section 8 of the Housing Act, 42 U.S.C § 1437f, because the Hayes family initially received project-based assistance to rent unit 538B from Pine Street Associates. Since Pine Street Associates opted out of a project-based program, we look to the Housing Act’s opt-out provision, § 1437f(c)(8).[2] In addition to imposing specific obligations on HUD and the property owner, the opt-out provision clearly contemplates the property owner having a right to terminate an assisted tenancy at some point following a valid opt-out from a project-based program. First, subparagraph (A) makes clear that an opting out property owner must provide notice of his or her intention not to renew the HAP contract to HUD and to the affected tenants, and that following termination of the HAP contract, HUD will provide tenant-based assistance to the affected tenants. See § 1437f(c)(8)(A). Although the forthcoming tenant-based assistance provides affected tenants with the financial means to “choose the place they wish to rent, which is likely to include the dwelling unit in which they currently reside,” nothing in § 1437f(c)(8)(A) obligates the property owner to renew expired leases. Second, subparagraph (B) provides, “the owner may not evict the tenants or increase the tenants’ rent payment until such time as the owner has provided the notice [of opt-out] and 1 year has elapsed.” § 1437f(c)(8)(B). But it is silent on a property owner’s termination rights following that notice period. ■ The parties do not dispute both that Pine Street Associates satisfied its obligations under the opt-out provision and that the Hayes family’s assistance converted to tenant-based assistance. Because termination of a HAP contract for project-based assistance is a qualifying “eligibility event” for enhanced voucher assistance, see § 1437f(t)(2), we look next to § 1437f(t), the enhanced voucher provision. B. The Enhanced Voucher Provision The enhanced voucher provision first states that unless explicitly provided for in 42 U.S.C § 1437f(t)(1)(A)-(D), “Enhanced voucher assistance ... shall be voucher assistance under subsection (o).” § 1437f(t)(1). The threshold question is therefore whether § 1437f(t)(1) limits property owners’ nonrenewal rights. If it does not, we look to nonrenewal under the ordinary voucher’s termination provision, § 1437f(o)(7)(C). We note at the outset that nothing in the enhanced voucher provision explicitly speaks to termination generally, much less to termination in the context of nonrenewal. It is undisputed that subparagraphs (A) and (D) do not limit property owners’ non-renewal rights. They provide that an assisted family “shall pay as rent no less than the amount the family was paying on the date of the eligibility event,” § 1437f(t)(l)(A), unless the family’s income “declines to a significant extent,” § 1437f(t)(l)(D). The parties dispute whether sub-paragraph (B) creates a right to remain, and if it does, whether and to what extent that right is enforceable against property owners. They also dispute whether subpar-agraph (C) exhausts the ways that an assisted family loses its eligibility to receive enhanced voucher assistance. Subparagraph (B) speaks to HUD’s obligation to provide the assisted family with the financial means to remain in the event that the family elects to do so. It states in relevant part: [T]he assisted family may elect to remain in the same project in which the family was residing on the date of the eligibility event for the project, and if, during any period the family makes such an election and continues to so reside, the rent for the dwelling unit of the family in such project exceeds the applicable payment standard established pursuant to subsection (o) of this section for the unit, the amount of rental assistance provided on behalf of the family shall be determined using a payment' standard that is equal to the rent for the dwelling unit (as such rent may be increased from time-to-time).... § 1437f(t)(l)(B). The language “the assisted family may elect to remain” plainly does not limit property owners’ nonrenewal rights. Our dissenting colleague, however, suggests that it does, because “extending this right to a tenant necessarily limits the rights of a landlord: if a statute guarantees tenants hot water, it also limits a property owner’s right not to install hot water plumbing.” Dissenting Op. at 113. This analogy is inapt. The statute does not guarantee the tenant an unconditional right to remain at the property. Rather, it guarantees the tenant the financial support necessary to pay a higher rent if the lease is renewed: Nowhere does the statute require the landlord to renew the tenant’s lease indefinitely. We recognize that a “statute should be construed to give effect to all its provisions, so that no part will be inoperative or superfluous, void or insignificant,” Corley v. United States, 556 U.S. 303, 314, 129 S.Ct. 1558, 173 L.Ed.2d 443 (2009), that § 1437f(c)(8)(A) already providés a right to remain during the year following a property owner’s notice of opt-out from a project-based program, and that § 524(d) of the Multifamily Assisted Housing Reform and Affordability Act of 1997, Pub. L. No. 105-65, tit. V, subtit. A, 111 Stat. 1344, 1408-09 (codified as amended at 42 U.S.C. § 1437f note), already obligates HUD to provide enhanced vouchers to eligible families. Still, for the reasons that follow, we do not believe that declining to require property owners to continuously renew enhanced-voucher tenancies renders the “may elect” language superfluous or otherwise meaningless. We need not read past § 1437f(t)(1)(B)’s plain language to identify its role in the statutory scheme. Following the initial notice year, § 1437f(c)(8)(A) obligates HUD to provide assistance “enabling [the assisted family] to choose the place they wish to rent, which is likely to include the dwelling unit in which they currently reside.” § 1437f(c)(8)(A). But if the post-opt-out rent for the “unit in which they currently reside” exceeds the payment standard under § 1437f(o)(1)(B), how can tenants be assured that HUD will meet its obligation under § 1437f(c)(8)(A)? Enter subparagraph (B) of the enhanced voucher provision, § 1437f(t)(l)(B). It obligates HUD to provide the assisted family with the financial means to remain after the notice period even if the required assistance exceeds the ordinary voucher’s payment standard. The rent becomes its own unit-specific payment standard. Hence the term “enhanced voucher.” In order for an assisted family to actually benefit from that assist tance, § 1437f(t)(1)(B) necessarily requires that enhanced vouchers be credited toward their rental obligations. This ensures that, so long as the family remains eligible under § 1437f(t)(l)(C), they may exercise their election to remain without being required to pay more than their statutorily prescribed portion of the rent. It makes their election to remain meaningful.[3] We next turn to - subparagraph (C), which states in relevant part: [S]ubparagraph (B) ... shall not apply and the payment standard for the dwelling unit occupied by the family shall be determined in accordance with subsection (o) [the ordinary voucher provision] if—(i) the assisted family moves, at any time, from such project; or (ii) the voucher is made available for use by any family other than the original family on behalf of whom the voucher was provided.... § 1487f(t)(1)(C). Essentially, if the assisted family moves or gives the voucher to another family, they lose eligibility to receive enhanced vouchers and their assistance converts, to ordinary tenant-based assistance. The Hayes family argues that because § 1437f(t)(1)(C) does not include the loss of eligibility at the behest of the property owner, and Harvey’s nonrenewal would trigger that loss by forcing them to move, he is obligated to continuously renew their lease. We disagree. First, subparagraph (O) relates back to subparagraph (B), neither of which speaks to nonrenewal. Whereas subparagraph (B) affords an assisted family the right to receive “enhanced” financial assistance to be credited toward their rental obligations, subparagraph (C) relieves HUD of the financial obligation to provide such assistance if the family moves or provides the enhanced voucher to another family. The substance of these subparagraphs is primarily financial. Second, to hold that § 1437f(t)(l)(C) is exhaustive of the specific ways in which an assisted family may lose eligibility for enhanced voucher' assistance would subject property owners to a perpetual lease. This would be a significant departure from the ordinary voucher provision which does not, in any way, limit property owners’ nonre-newal rights.[4] See § 1437f(o)(7)(C). It would also make opt-out from project-based programs, under which property-owners do have termination rights, see § 1437f(d)(l)(B), far less attractive. Such a result would likely discourage property owner participation in the first, place, in turn frustrating realization of section 8’s explicit purpose.[5] Had Congress intended to require property owners to continually renew enhanced-voucher tenancies, we are confident it would have said so clearly. See Whitman v. Am. Trucking Ass’ns, 531 U.S. 457, 468, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) (explaining that Congress does not “hide elephants in mouseholes” by “alter[ing] the fundamental details of a regulatory scheme in vague terms or ancillary provisions”). Our dissenting colleague believes that our interpretation of the enhanced voucher provision puts us at odds with other courts that have interpreted the statutory “right to remain." But he fails to adequately consider that the Ninth and D.C. Circuits concluded not that enhanced-voucher recipients have a right to remain both during and upon the natural expiration of their lease term, but specifically that a landlord who refuses to accept enhanced vouchers as part of a tenant’s rental payment cannot then evict those tenants for nonpayment. See Park Vill., 636 F.3d at 1156 (“The statute gives ‘assisted families’ the right ‘to remain in the same project.’ The statute also authorizes' owners to. raise their rents to a reasonable market rate and to receive a housing assistance payment, by means of an enhanced voucher, to cover the authorized increases in rent. It does not authorize owners to raise their rents to a reasonable market rate, but then to refuse to accept payment by means of an enhanced voucher, and evict an ‘assisted family’ for nonpayment of rent.”); Feemster v. BSA L.P., 548 F.3d 1063, 1069 (D.C. Cir, 2008) (“Neither the U.S. Housing Act nor HIJD’s interpretation of that Act bars landlords from terminating a tenancy on any ground permitted by D.C. law. One thing that [the landlord] may not do, however, is refuse to accept payment by voucher and then contend that eviction is warranted for nonpayment of rent,”). Our dissenting colleague further suggests that our interpretation of Park Village—where a midterm eviction for nonpayment was at issue—-is flawed because we “conflate[] one of the Ninth Circuit’s holdings with the other.” Dissenting Op. at 120-21. The majority does not, however, “conflate” Park Village’s holdings. Rather, it agrees with the Ninth Circuit’s interpretation regarding the “may elect to remain” language insofar as it lends meaning to the 2000 amendment—that tenants are only required to pay their “statutorily prescribed portion of the rent,” and that owners cannot “refuse to accept payment by means of an enhanced voucher, and evict an ‘assisted family’ for nonpayment of rent.” Park Vill., 636 F.3d at 1166. Here we are faced not with an eviction for nonpayment, as in Park Village, but with a nonrenewal of a naturally expired rental agreement. This is a meaningful distinction. It makes sense that a property owner who reaps the benefit of opting out by increasing rent to market rate cannot then evict an assisted family who pays only their statutorily required portion of the rent—the family’s financial ability to remain is the core of the enhanced voucher provision. But upon expiration of a HAP contract, the value and substance of an enhanced voucher is informed primarily by the family’s rental agreement with the property owner. And nothing in the enhanced voucher provision, or elsewhere in the statute, explicitly or implicitly requires property owners to renew such agreements.[6] We conclude that § 1437f(t)(l)(B) obligates HUD to provide “enhanced” financial assistance to be credited toward an assisted family’s rental obligations during any period in which the family remains eligible under § 1437f(t)(l)(C), and that § 1437f(t)(l)(C) speaks only to the ways in which the family’s conduct may relieve HUD of that financial obligation. Section 1437f(t) does not limit property owners’ nonrenewal rights. C. The Termination Provision Given § 1437f(t)’s silence as to property owners’ nonrenewal rights, we look to § 1437f(o)’s termination provision, which states: [D]uring the term of the lease, the owner shall not terminate the tenancy except for serious or repeated violation of the terms and conditions of the lease, for violation of applicable Federal, State, or local law, or for other good cause.... § 1437f(o)(7)(C) (emphasis added). Under the plain language of § 1437f(o), Harvey’s termination rights were limited only during the term of the Hayes family’s lease.[7] Harvey did not seek a midterm eviction. He sought to terminate the Hayes family’s tenancy upon the natural expiration of their lease term. Therefore, in order for us to find that the enhanced voucher provision precludes Harvey’s termination through nonrenewal, we would need to apply the termination provision in a way that departs from its application to the ordinary voucher provision.[8] Through policy guidance, HUD has purported to extend § 1437f(o)(7)(C)’s midterm limitations to nonrenewals of enhanced-voucher tenancies: Tenants who receive an enhanced voucher have the right to remain in their units as long as the units are offered as rental housing. The tenant must have been issued an enhanced voucher sufficient to pay the rent charged for the unit, provided that the rent is reasonable. Owners may not terminate the tenancy of a tenant who exercises this right to remain except for cause under Federal, State or local law. [[Image here]] This protection continues as long as the project is offered as rental housing, absent good cause to terminate tenancy under Federal, State or local law and provided the [public housing agency] continues to find the rent reasonable, Owners must continually renew the lease of an' enhanced voucher family. Section 8 Renewal Policy Guidebook § 11-3(B), at pp. 3-4.[9] The Hayes family and the dissent assert that we should defer to HUD’s interpretation of the enhanced voucher provision. But as an agency interpretation contained in a guidance document it lacks the force of law and is not entitled to Chevron deference. See Christensen v. Harris County, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). At most, HUD’s interpretation is “entitled to respect” to the extent that it has “the power to persuade.” Id. (citing Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). We do not dispute that HUD has “relative expertise” in administering the statutory scheme or that HUD has long held its position on nonrenewal of enhanced-voucher tenancies. See Dissenting Op. at 118-19. But expertise and consistency do not alone require deference.[10] See Hagans v. Comm’r of Soc. Sec., 694 F.3d 287, 304-05 (3d Cir. 2012). We also consider “the thoroughness evident in [the agency’s] consideration, the validity of its reasoning ... and all those factors that give it the power to persuade.” Young v. United Parcel Service, Inc., — U.S. —, 135 S.Ct. 1338, 1352, 191 L.Ed.2d 279 (2015). Here, the “brevity” of HUD’s statements and “undeveloped reasoning counsel toward a lower level of deference.” Hagans, 694 F.3d at 305. For the reasons discussed above, HUD’s statement that “owners must continually renew the lease of an enhanced voucher tenancy,” contained in one paragraph of HUD’s nearly 200-page Section 8 Renewal Guidebook, is not supported by the statute’s clear text. HUD’s iterations of its nonrenewal policy do not show otherwise. We further acknowledge that, in the framework of non-binding Skidmore deference that the dissent references, an agency may be entitled to some degree of deference given its “specialized experience,” and given the “value of uniformity.” United States v. Mead Corp., 533 U.S. 218, 234, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (quoting Skidmore, 323 U.S. at 140-41, 65 S.Ct. 161). Our dissenting colleague suggests that our holding imposes a particularly high “risk of disuniformity” because,, in Park Village, the Ninth Circuit supposedly “ruled in favor of HUD’s interpretation.” Dissenting Op. at 119. The majority does not, however, create any such “disuniformity.” Park Village’s holding was limited to the question before it—involving a midterm eviction for nonpayment—and the majority agrees with the disposition of that limited question. See Park Village, 636 F.3d at 1153 (“Plaintiffs have a statutory right to remain in the complex, and are, accordingly, entitled to an injunction barring Defendants from evicting them solely because they are paying only their statutorily determined portion of each month’s rental payment.”). Cabining the “right to remain” in this instance does not create “disuniformity.” Given the enhanced voucher provision’s clear directive that, other than the four enhanced voucher distinctions, assistance “shall be voucher assistance under subsection (o) of this section,” 42 U.S.C. § 1437f(t)(1), its silence on nonrenewal, and the, Hayes family’s failure to point us to any other part of the statute supporting a rejection of § 1437f(o)(-7)(C)’s clear text as applied to the enhanced voucher provision, we find HUD’s guidance unpersuasive insofar as it interprets the enhanced voucher provision as extending the requirement of cause to nonrenewals. We do not believe our holding today will render the protections of the enhanced voucher provision meaningless or produce a result at odds with the drafters’ intentions. The right conferred by the enhanced voucher provision is the right to receive and use enhanced vouchers to satisfy an assisted family’s rental obligations. As HUD has advised property owners, enhanced voucher assistance aims “to mitigate the impact of the conversion action on the family’s rent.” Memorandum for Multifamily Project Owners from- Benjamin ‘T. Metcalf, Deputy Assistant Sec’y for Multifamily Housing Programs (June 5, 2014) (emphasis added), https://portal.hud. gov/hudportal/documents/huddoc?id= Right _Remain.pdf. Nothing in the statute’s language, or otherwise, indicates that it aims to provide assisted families with the right to a perpetual tenancy terminable only for cause.[11] Additionally, “[t]he HUD regulation merely creates a floor of protection, which local laws may enhance.” Barrientos, 583 F.3d at 1207. See id. at 1211 (“Congress and HUD never explicitly rejected the application of more protective local standards to' assisted tenants; and in certain cases, expressly allowed for it.” (citing 42 U.S.C. § 1437f(o)(7)(D)(vi) and 24 C.F.R. § 982.53(d))). Our holding simply defines that floor in the context of nonrenewals. Because the enhanced voucher provision does not compel a property owner to renew an enhanced-voucher tenancy after the natural expiration of its lease term, we need not determine whether Harvey had cause to terminate under the statute. Harvey is not barred from initiating eviction proceedings in accordance with state and local law. IV. Conclusion As the Supreme Court recently observed, “reasonable people can disagree with how Congress balanced the various social costs and benefits” in a certain area—here, affordable housing for low-income families. Henson v. Santander Consumer USA, Inc., — U.S. —, 137 S.Ct. 1718, 1725, 198 L.Ed.2d 177 (2017). “Constant competition .between constable and quarry, regulator and regulated, can come as no surprise in our changing world. But neither should the proper role of the judiciary in that process—to apply, not amend, the work of the People’s representatives.” Id. at 1726. The judgment of the District Gourt will be affirmed. . It is the existence of the HAP contract and related lease that subject Harvey to section 8. See Powell v. Hous. Auth. of City of Pittsburgh, 571 Pa. 552, 812 A.2d 1201, 1203 (2002) (explaining that if the “PHA approves the tenancy, the PHA and the owner enter into a [HAP] contract ... under which the PHA makes rental payments to subsidize occupancy,” and, in turn, "the owner and the now-Section 8 participant enter into a lease for the subsidized unit”); see also U.S. ex rel. Richards v. R & T Investments LLC, 29 F.Supp.3d 553, 562 (W.D. Pa. 2014) (stating that an owner "must enter into” a HAP contract "[t]o receive assistance payments”). The dissent states "other courts have held that- the enhanced voucher statute, can impose requirements even on landlords who are pot covered by a HAP contract.” Dissenting Op. at 112 n.1 (citing Park Mill. Apartment Tenants Ass'n v. Mortimer Howard Tr., 636 F.3d 1150, 1161—62 (9th Cir, 2011)). The section of Park Village cited for this proposition, however, pertains to whether the District Court erred in granting a mandatory injunction requiring an owner to enter into a HAP contract, "despite opting out of Section 8.” Park Vill., 636 F.3d at 1161. There, the Ninth Circuit.held.that an owner was free to execute a HAP contract if he so chose; if he did, he was entitled to "fair market rent via enhanced vouchers,” but if not, he would forgo "significant rental income,” while avoiding obligations imposed by HAP contracts. Id. at 1161-62. Here, it is evident that the rights and duties under section 8 are set forth in the HAP contract and related lease. . Although the opt-out provision governs tenants’ rights before an enhanced voucher is provided and therefore does not govern this case, given “the fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme,” Util. Air Regulatory Grp. v. EPA, — U.S. —, 134 S.Ct. 2427, 2441, 189 L.Ed.2d 372 (2014) (internal quotation marks omitted), we will walk through all of the relevant statutory provisions. Our dissenting colleague sidesteps this basic principle by homing in on the statute’s "may elect to remain” language in isolation from its place in the Housing Act's overall scheme. . Before the enactment of the current statutory language, § 1437f(t)(l)(B) provided that a family was entitled to an enhanced voucher "during any period that the assisted family continues residing in the same project.” Pub. L. No. 106-74, tit. V, § 538(a), 113 Stat. 1047, 1122 (1999). But in 2000 Congress amended the provision to provide that “the assisted family may elect to remain ... and if, during any period the family makes such an election and continues to so reside....” Pub. L. No. 106-246, div. B, tit. II, § 2801, 114 Stat. 511, 569. The Hayes family and the dissent argue that the 2000 amendment is evidence that Congress intended to clarify that property owners have no say in the assisted family’s election to remain. In our view, through the 2000 amendment Congress intended to make clear that, following a valid opt-out, HUD could not force an assisted family to leave the unit and that the family's enhanced vouchers must be credited toward their rental obligations. See Park Vill., 636 F.3d at 1156 (finding that the statute "does not authorize owners to raise their rents to a reasonable market rate, but then to refuse to accept payment by means of an enhanced voucher, and evict an 'assisted family’ for nonpayment of rent"). But after a rental agreement naturally expires, so too do the attendant rental obligations. At that point, the statute goes silent. Nothing in its text explicitly or impliedly obligates property owners to continuously renew enhanced-voucher tenancies. . Our dissenting colleague suggests that the enhanced voucher provision is "by its very title, meant to be a departure from the ordinary voucher provision.” Dissenting Op. at 114-15. On this point, we agree. But enhanced vouchers ‘‘depart[ ] from the ordinary voucher provision” in limited ways, none of which relate to termination. Furthermore, the dissent suggests that despite the "ostensibly shared purpose” between the enhanced and ordinary voucher statutes, there is “no reason to believe that ... Congress intended these two statutes to be read as if they were one.” Id. Again, we agree on this point—the majority does not read the provisions "as if they were one.” It is undisputed, however, that these are provisions of the same statute, and there is no reason to believe that section 8’s clear purpose does not extend to all of its provisions. . The dissent suggests, grounding its argument in what Congress "might .,. have perceived” or what it “might well have weighed,” that because the “set of landlords affected [by the enhanced voucher provision] is small and, more importantly, relatively fixed ,.. there is less need to encourage landlord participation” in the program. Dissenting Op. at 115-16. We disagree. We find no reason that Congress would encourage property owner participation in project-based programs to any lesser extent than it encourages participation in the voucher programs. Although by the time owners are actually affected by the enhanced voucher provision their numbers are "relatively fixed,” an owner can today decide to participate in a project-based • program, and later, to opt out. Thus, the number of prospective participants in project-based programs is not necessarily fixed. Encouraging participation in' both assistance programs, in part by avoiding tying the hands of property owners upon the expiration of rental agreements, is required to realize section 8’s explicit purpose. . In fact, the Ninth Circuit found that requiring property owners to enter into HAP contracts could “render essentially worthless an owner’s right to lawfully opt-out of its involvement in the Section 8 program" and “frustrate Congress’s clear intention in the 1996 amendments to the Act to end so-called ‘endless leases,’ under which owners could not refuse to renew the leases of Section 8 tenants at the conclusion of a lease term.” Park Vill., 636 F.3d at 1161-62. The same reasoning applies here. Requiring property owners to continuously renew rental agreements would render their opt-out "essentially worthless.” . Before it was repealed in 1996, Congress did burden property owners upon the natural expiration of an ordinary voucher lease term in what was known as the "endless lease” provision. Pub. L. No. 104-134, tit. II, § 203(c)(2), 110 Stat. 1321, 1321-281 (1996). It stated “the owner shall not terminate the tenancy except for serious or repeated violation of the terms and conditions of the lease, for violation of applicable Federal, State, or local law, or for other good cause.” 42 U.S.C. § 1437f(d)(1)(B)(ii) (1994) (repealed 1996). . The dissent concedes that enhanced-voucher tenants may be evicted for cause but offers no textual justification for imposing limits on nonrenewals of enhanced-voucher tenancies in the face of § 1437f(o)(7)(C)’s silence on the issue. See Dissenting Op. at 123 n.14. . Currently pending is a proposed rule which seeks to “codify [HUD’s] existing policy concerning ... the right of enhanced voucher holders to remain in their units.” Tenant-Based Assistance: Enhanced Vouchers, 81 Fed. Reg. 74,372 (proposed October 26, 2016) (to be codified at 24 C.F.R. pt. 982). The proposed rule would amend 24 C.F.R. § 982.309 to add a paragraph acknowledging enhanced-voucher tenants’ right to remain absent "repeated lease violation or other good cause.” Id. at 74,375. It goes without saying that this proposed rule lacks the force of law, and so has no impact on the present case. . Our dissenting colleague suggests that Hagans instructs "a relatively high level of deference is warranted,” because the "same factors are at play here.” Dissenting Op. at 119— 20. We disagree. The Hagans Court concluded that a high level of deference was warranted in that instance because, inter alia, it determined that: the Social Security Administration is an agency with “exceptionally broad authority to manage a complex, nationwide administrative system,” that administering the Social Security Act is the SSA’s "central purpose,” and that the "SSA has developed a massive body of expertise [over] 56 years” which it has “consistently applied ... during the past 20 years.” Hagans, 694 F.3d at 305. Importantly, the Hagans Court also found that "the SSA’s interpretation of [the statute at issue was] sufficiently persuasive to defer to it.” Id. While these factors in Hagans—considered together—counseled for deference, such factors are not present here. . Contrary to the dissent’s suggestions, the idea of a perpetual lease is not a ''strawman.” See Dissenting Op. at 121-22. Because the statute does not by its terms require cause for .nonrenewal, any limitations on nonyenewal would necessarily come from the HAP contract or related lease. After those documents have' expired, extending any of their limitations would in effect be subjecting the property owners to a perpetual tenancy. The statute does not, however, provide for a perpetual tenancy. In referring to the question of a perpetual tenancy as a "strawman,” the dissent fails to consider the actual implications of its interpretation of the enhanced voucher provision.