**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-2692
_____

THEODORE HAYES;
AQEELA FOGLE,
Appellants

v.

PHILIP E. HARVEY
_____

On Appeal from the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civ. Action No. 2-15-cv-02617)
District Judge: Honorable Nitza I. Quiñones Alejandro
_____

Argued on January 18, 2017 before Merits Panel
Argued En Banc on May 16, 2018
_____

Before: SMITH, *Chief Judge*, MCKEE, AMBRO,
CHAGARES, JORDAN, HARDIMAN, GREENAWAY, JR.,
VANASKIE, SHWARTZ, KRAUSE, RESTREPO, BIBAS,
and FISHER[*], *Circuit Judges*.

(Opinion Filed: August 31, 2018)

Rachel Garland [Argued]
George Gould
Michael Donahue
Community Legal Services
1424 Chestnut Street
Philadelphia, PA 19102
            *Counsel for Appellants*

Susanna Randazzo [Argued]
Kolber & Randazzo
One South Broad Street, Suite 1610
Philadelphia, PA 19107
            *Counsel for Appellee*

Chad A. Readler, Acting Assistant Attorney General
William M. McSwain, United States Attorney
Michael S. Raab
Gerard J. Sinzdak [Argued]
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 201530
            *Counsel for Amicus Curiae U.S. Department of
            Housing and Urban Development*

_____

[*] The Honorable D. Michael Fisher assumed senior
status on February 1, 2017.

2

Louis S. Rulli
University of Pennsylvania School of Law
3501 Sansom Street
Philadelphia, PA 19104


Susanna R. Greenberg
University of Pennsylvania School of Law
3400 Chestnut Street
Philadelphia, PA 19104
*Counsel for Amici Curiae Philadelphia
Association of Community Development
Corporations, Action-House, Inc., Pennsylvania
Legal Aid Network, Philadelphia Legal
Assistance, and SeniorLAW Center in Support
of Appellants*

James R. Grow
National Housing Law Project
703 Market Street, Suite 200
San Francisco, CA 94103

Daniel Urevick-Ackelsberg
Public Interest Law Center
1709 Benjamin Franklin Parkway, Floor 2
Philadelphia, PA 19103
*Counsel for Amici Curiae National Housing
Law Project, Housing Justice Center, and
Sargent Shriver National Center on Poverty
Law, National Alliance of HUD Tenants,
National Housing Trust, Legal Aid Society of
New York, Action-Housing, Inc., and
Philadelphia Housing Authority in Support of*

*Appellants*

Jennifer MacNaughton
City of Philadelphia Law Department
1515 Arch Street, 17th Floor
Philadelphia, PA 19102

> *Counsel for Amici Curiae City of Philadelphia
> and Philadelphia Housing Authority in Support
> of Appellants*

_____

OPINION
_____


GREENAWAY, JR., *Circuit Judge*.

The Hayes family receives enhanced voucher rental assistance from the federal government, and a federal statute provides that enhanced voucher holders "may elect to remain" in their housing developments, even after their landlord has opted out of the federal housing assistance program. 42 U.S.C. § 1437f(t)(1)(B). But the Hayes family's landlord, Appellee Philip Harvey, contends that this statutory right to "elect to remain" does not apply at the end of a lease term. Thus, according to Harvey, he is permitted to evict the Hayes family without cause once their lease has expired. The District Court agreed and granted Harvey's motion for summary judgment. We will reverse, however, because the statute's plain language and history make evident that enhanced voucher holders may not be evicted absent good cause, even at the end of a lease term. We will therefore remand so that the District Court may

4

consider whether Harvey has good cause to evict under the circumstances of this case.

## I. BACKGROUND

### A.    Statutory and Regulatory Background

In 1974, Congress created the Section 8 housing program "[f]or the purpose of aiding low-income families in obtaining a decent place to live."  42 U.S.C. § 1437f(a); Housing and Community Development Act of 1974, Pub. L. No. 93-383, § 201(a), 88 Stat. 633, 662–66 (1974) (amending the United States Housing Act of 1937) (codified as amended at 42 U.S.C. § 1437f).  The program, which is funded by the Department of Housing and Urban Development ("HUD") and administered by local public housing agencies ("PHAs"), 24 C.F.R. § 982.1(a)(1), generally provides two different types of rental assistance: "project-based" subsidies and "tenant-based" subsidies.  *Id.* § 982.1(b)(1).

Project-based assistance is tied to specific housing developments or units.  42 U.S.C. § 1437f(f)(6); 24 C.F.R. § 982.1(b)(1).  Owners of such properties enter into long-term contracts with the applicable PHA, under which the owners agree to rent their properties to eligible low-income families and the PHA agrees to provide rental assistance payments to the owners on behalf of the assisted tenants.  *See* 42 U.S.C. § 1437f(b); 24 C.F.R. §§ 983.202, 983.205.  The owners then enter into written leases with particular families for individual units.  *See* 24 C.F.R. § 983.256.

Tenant-based assistance, by contrast, is tied to a specific tenant family and travels with the family if it moves.  42 U.S.C. § 1437f(f)(7); 24 C.F.R. § 982.1(b).  Tenant-based vouchers

5

may be used on rental units anywhere in the United States, so long as the unit is in the jurisdiction of a PHA that administers a voucher program. 24 C.F.R. § 982.1(b)(1). Once the assisted family selects an eligible unit and the applicable PHA approves the tenancy, the PHA enters into a contract with the property owner, under which the PHA agrees to make rental assistance payments to the owner. *Id.* § 982.1(b)(2). Unlike long-term PHA contracts for project-based assistance, a PHA contract for tenant-based assistance can provide for a term as short as one year, and the contract covers only the single unit and the particular assisted family. *See id.* §§ 982.1(b)(2), 982.309(a). But as with project-based assistance, in addition to the PHA contract, the property owner also enters into a written lease with the assisted family. *Id.* § 982.308(b).

Under both project-based and tenant-based assistance, the assisted family contributes a prescribed amount toward the overall rental payment, generally equal to thirty percent of the tenant family's monthly "adjusted income" or ten percent of its monthly gross income, whichever is greater. 42 U.S.C. § 1437f(o)(2); *see also id.* § 1437a(a)(1). The government pays the balance of the rent amount up to a statutorily capped amount known as the "payment standard," which normally cannot exceed 110 percent of the fair market rental value for the property, as established by HUD. *See id.* § 1437f(c), (o)(1)–(2).

In the late 1980s, many of the long-term, project-based assistance contracts between property owners and PHAs began to expire. Concerned that property owners would decline to renew the contracts and force low-income tenants out by raising rents to rates that exceeded the statutory payment standard, Congress passed a number of laws intended to protect tenants in the event their landlords converted their subsidized

6

units to normal, market-based housing. Among these measures was a notice requirement enacted as part of the Housing and Community Development Act of 1987. *See* Pub L. No. 100-242, § 262(a), 101 Stat. 1815, 1890 (1988) (codified as amended at 42 U.S.C. § 1437f(c)(8)). In its present iteration, this measure requires that owners provide tenants and HUD with at least one year's notice before opting out of their project-based assistance contracts. 42 U.S.C. § 1437f(c)(8)(A). Owners "may not evict the tenants or increase the tenants' rent payment until" the one-year period has elapsed. *Id.* § 1437f(c)(8)(B).

Roughly a decade later, as project-based contracts continued to expire, Congress enacted additional tenant protections through creation of the "enhanced voucher" program. *See* Pub L. No. 106-74, 113 Stat. 1047, 1109–15, 1121–24 (1999). Whereas the notice requirement protects project-based tenants before their property owner's long-term contract with the applicable PHA expires, enhanced vouchers come into play after the notice period has elapsed and the property owner has completed the process of opting out of the project-based assistance program. HUD is statutorily required to provide enhanced vouchers to tenants who had previously been receiving project-based assistance, beginning on the date the owner's project-based contract expires and is not renewed, *see* 42 U.S.C. § 1437f note—a date that the statute refers to as the "eligibility event," *id.* § 1437f(t)(2).

Enhanced vouchers are generally governed by the ordinary voucher provision, 42 U.S.C. § 1437f(o), except where modified by the enhanced voucher provision, § 1437f(t). *See* 42 U.S.C. § 1437f(t)(1). As originally passed in 1999, the enhanced voucher provision stated that

7

during any period that the assisted family continues residing in the same project in which the family was residing on the date of the eligibility event for the project, if the rent for the dwelling unit of the family in such project exceeds the applicable payment standard established pursuant to subsection (o) for the unit, the amount of rental assistance provided on behalf of the family shall be determined using a payment standard that is equal to the rent for the dwelling unit (as such rent may be increased from time-to-time), subject to paragraph 10(A) of subsection (o) . . . .

Pub L. No. 106-74, § 538(a), 113 Stat. at 1122. Thus, unlike ordinary tenant-based and project-based vouchers, enhanced vouchers were designed to cover the difference between the tenant's statutorily prescribed rent contribution and the rent amount set by the property owner after opting out of the project-based assistance program, *id.* § 1437f(t)(1)(B)—which is usually higher than the payment standard that would otherwise apply to ordinary project-based vouchers. Indeed, the rent amount that the owner chooses to charge after opt-out is not subject to any specific limit and can be increased periodically. It need only "be reasonable in comparison with rents charged for comparable dwelling units in the private, unassisted local market." *Id.* § 1437f(o)(10)(A).

Aside from the higher payment standard, enhanced vouchers are, in a sense, a hybrid of the two types of ordinary vouchers. Like project-based vouchers, they are tied to the particular project; if the family moves out of that project, their enhanced voucher eligibility terminates. *See id.* § 1437f(t)(1)(C)(i). Like tenant-based vouchers, enhanced

8

vouchers are tied to the particular assisted family; if the family attempts to transfer the voucher to a third party who was not residing in the unit on the date of the eligibility event, the family's enhanced voucher eligibility, again, terminates, and the payment standard for the unit is determined pursuant to the ordinary voucher provision. *Id.* § 1437f(t)(1)(C)(ii).

In 2000, Congress amended the enhanced voucher provision to add the language at the heart of this case. *See* Pub L. No. 106-246, § 2801, 114 Stat. 511, 569 (2000) (codified at 42 U.S.C. § 1437f(t)(1)(B)). Importantly, the first clause of the provision was changed, and as a result, the provision in its current form now states that

> *the assisted family may elect to remain in the same project in which the family was residing on the date of the eligibility event for the project, and if, during any period the family makes such an election and continues to so reside*, the rent for the dwelling unit of the family in such project exceeds the applicable payment standard established pursuant to subsection (o) of this section for the unit, the amount of rental assistance provided on behalf of the family shall be determined using a payment standard that is equal to the rent for the dwelling unit (as such rent may be increased from time-to-time), subject to paragraph 10(A) of subsection (o) of this section and any other reasonable limit prescribed by the Secretary [of HUD], except that a limit shall not be considered reasonable for purposes of this subparagraph if it adversely affects such assisted families . . . .

42 U.S.C. § 1437f(t)(1)(B) (emphasis added).[1]

**B.     Factual and Procedural Background**

In 1982, Florence Hayes and her son Theodore moved into 538B Pine Street, a four-bedroom unit in a duplex built as part of Washington Square East, a project-based Section 8 development located in the Society Hill neighborhood of Philadelphia.  A few years later, they were joined by Aqeela Fogle, Florence's granddaughter and Theodore's niece. Theodore moved out some time in the 1980s before moving back in 2003.  Florence and Fogle, however, never left. Florence lived in the unit until her death in 2015.  Fogle continues to live there, now with her three minor children.

In early 2008, the then-owners of Washington Square East, Pine Street Associates, decided not to renew their project-based Section 8 contract with the Philadelphia Housing Authority upon its expiration on January 17, 2009.  Consistent with federal law, on January 9, 2008, Pine Street Associates notified the tenants of Washington Square East that it would not be renewing the contract.  The notification letter explained:

---

[1] The final two clauses of the provision were also added in 2000, through two subsequent amendments.  *See* Pub. L. No. 106-377, § 1(a)(1), 114 Stat. 1441, 1441A-24 (Oct. 27, 2000) (inserting "and any other reasonable limit prescribed by the Secretary"); Pub L. No. 106-569, § 903(a), 114 Stat. 2944, 3026 (Dec. 27, 2000) (inserting "except that a limit shall not be considered reasonable for purposes of this subparagraph if it adversely affects such assisted families").

Federal law allows you to elect to continue living at this property provided that the unit, the rent and we, the owner, meet the requirements of the Section 8 tenant-based assistance program. As an owner, we will honor your right as a tenant to remain at the property on this basis as along [sic] as it continues to be offered as rental housing, provided that there is no cause for eviction under Federal, State or local law.

J.A. 636. The Hayes family opted to remain in their unit, and, as a result, they began receiving enhanced voucher assistance after Pine Street Associates' project-based contract expired in January 2009.

The following year, Pine Street Associates sold a parcel of three duplex houses to Philip Harvey—a parcel that included the Hayes family's unit at 538 Pine Street. Harvey subsequently signed a Housing Assistance Payment ("HAP") contract with the Philadelphia Housing Authority and executed a one-year, Section 8 model lease with Florence Hayes, who at the time was designated head of the Hayes household. The lease listed Florence and Theodore Hayes, Aqeela Fogle, and Fogle's three minor children as the family members authorized to live in the unit. The parties renewed the lease in 2011 and 2013 for additional two-year terms, the second of which expired on April 30, 2015.

In February 2015, Florence Hayes passed away, and the Philadelphia Housing Authority transferred the head of household status to Theodore Hayes. Two weeks later, Harvey sent the Hayes family a letter stating that he did not intend to renew their lease when it expired at the end of April, citing Florence Hayes's passing and his desire to renovate the unit as

11

reasons for the nonrenewal. Upon expiration of the lease, however, the Hayes family did not vacate the apartment, and on May 1, Harvey sent a second letter reiterating that he would not sign a new lease. In this second letter, Harvey again provided Florence Hayes's death and his plan to renovate as reasons for nonrenewal. But Harvey also added a third reason: his intent to move his daughter into the apartment. Harvey concluded the letter by stating that he would initiate eviction proceedings if the family did not move out within five days.

Theodore Hayes and Aqeela Fogle responded by filing suit in the District Court, seeking declaratory relief and an order enjoining Harvey from evicting them. They argued that the enhanced voucher provision provided them with an enforceable right to remain in their unit. As a result, Harvey could not evict the family without cause, and, according to them, Harvey's stated reasons did not constitute good cause. Harvey, on the other hand, contended that he was not even bound by the enhanced voucher statute because he had never participated in the project-based program. Alternatively, he argued that the statute did not create a right that was enforceable at the end of a lease term.

The parties filed cross-motions for summary judgment, and the District Court ruled in favor of Harvey. *Hayes v. Harvey*, 186 F. Supp. 3d 427 (E.D. Pa. 2016). It reasoned that Harvey was bound by the enhanced voucher statute by virtue of the HAP contract and lease that he executed with the Housing Authority and the family, respectively, but that the statute did not require property owners to renew the leases of enhanced voucher holders. *Id.* at 433–40. Accordingly, Harvey was entitled to initiate proper eviction proceedings if the family did not vacate the premises within a reasonable period of time. *Id.* at 440. After Hayes and Fogle filed this

12

appeal, however, the District Court issued an injunction prohibiting Harvey from taking any measures to evict while the appeal was pending.

## II. JURISDICTION & STANDARD OF REVIEW

The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291—with one caveat. While this appeal was pending, Theodore Hayes moved out of 538B Pine Street. Because he no longer has "a legally cognizable interest in the outcome" of the case, his claims are moot and we lack jurisdiction over them. *United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union v. Virgin Islands*, 842 F.3d 201, 208 (3d Cir. 2016) (quoting *Cty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). Aqeela Fogle still lives in the unit with her three children, though. She has been processed as the new head of household and continues to be eligible to receive enhanced voucher assistance, because she resided in the unit on the date of the eligibility event, *see* 42 U.S.C. § 1437f(t)(1). As a result, Fogle continues to have a concrete interest at stake, and an "occasion for meaningful relief" continues to exist. *United Steel Paper*, 842 F.3d at 208 (quoting *Rendell v. Rumsfeld*, 484 F.3d 236, 240 (3d Cir. 2007)). We therefore have jurisdiction over her claims, which are the same as those that were asserted by Hayes.

We exercise plenary review of a district court's order granting summary judgment. *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016). We will affirm if, viewing the evidence in the light most favorable to the nonmoving party, *Burns v. Pa. Dep't of Corr.*, 642 F.3d 163, 170 (3d Cir. 2011), we conclude that "there is no genuine

13

dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).

## III. DISCUSSION

### A.    The Section 8 Statute's Application to Harvey

As a threshold matter, Harvey argues that we should affirm the District Court on an alternative ground. He contends, as he did below, that he is not bound by any of Section 8's requirements because he purchased the property free and clear of encumbrances, without any deed restrictions or federal mortgage, and after the previous owner had already opted out of the Section 8 program. We disagree—albeit for different reasons than those provided by the District Court.

The District Court concluded that Harvey was obligated to comply with the program's requirements because he was "a party to a tenant-based HAP contract and related lease," which were "governed by, and subject to, . . . the Section 8 statute." *Hayes*, 186 F. Supp. 3d at 433. But nothing in the enhanced voucher provision limits its effect to the original owner. *See* 42 U.S.C. § 1437f(t). Indeed, § 1437f(t)(1)(C) provides only two conditions under which enhanced voucher eligibility terminates: when the family moves and when the voucher is used by someone other than the original family. Neither involves the opt-out owner's sale of the property. Although the Section 8 scheme is generally administered through the use of contracts and leases, nothing in the statute itself conditions its effect in all circumstances on common law devices. Accordingly, the enhanced voucher provision applies even to landlords who choose not to enter into HAP contracts. *See Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1161–62 (9th Cir. 2011) (holding that property

14

owners must respect eligible tenants' statutory right to elect to remain even if they choose not to execute a HAP contract, thereby foregoing fair market rent via enhanced vouchers).

Here, of course, Harvey did enter into a HAP contract and lease, but that is of no moment for our present purposes. Harvey purchased a former project-based Section 8 property, where enhanced voucher tenants are currently residing. By virtue of those facts alone, he falls within the scope of the Section 8 statute.[2]

## B.    Enhanced Voucher Holders' Right to "Elect to Remain"

### 1.    The Statutory Text and History

Turning to whether the enhanced voucher provision requires property owners like Harvey to continuously renew

---

[2] Relatedly, Harvey argues that, irrespective of any tenant protections the Section 8 statute may provide, provisions of the HAP contract and lease permit him to evict the Hayes family pursuant to Pennsylvania law. We need not examine the validity of this argument, because even if Harvey is correct as a matter of state law, "[t]he Supremacy Clause preempts any state law that 'interferes with or is contrary to federal law.'" *Zahner v. Pa. Dep't of Human Servs.*, 802 F.3d 497, 512 (3d Cir. 2015) (quoting *Free v. Bland*, 369 U.S. 663, 666 (1962)). Thus, if the enhanced voucher provision provides eligible families a right to elect to remain that is enforceable against property owners at the end of a lease term, it would preempt the application, in this case, of any principles of Pennsylvania law that permit nonrenewal without cause.

enhanced voucher tenancies, we begin, as we do in all cases involving statutory interpretation, with the statute's text. *Doe v. Hesketh*, 828 F.3d 159, 167 (3d Cir. 2016). If the statutory language is unambiguous, our inquiry is ordinarily complete. *Id.* We do not examine the language in isolation, however. "A statutory provision is not ambiguous simply because 'by itself, [it is] susceptible to differing constructions.'" *Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*, 539 F.3d 199, 210 (3d Cir. 2008) (alteration in original) (quoting *In re Price*, 370 F.3d 362, 369 (3d Cir. 2004)). Rather, in examining the statutory language, "we take account of 'the specific context in which that language is used, and the broader context of the statute as a whole.'" *Id.* (quoting *In re Price*, 370 F.3d at 369).

In relevant part, the current version of the enhanced voucher provision states:

> [T]he assisted family may elect to remain in the same project in which the family was residing on the date of the eligibility event for the project, and if, during any period the family makes such an election and continues to so reside, the rent for the dwelling unit of the family in such project exceeds the applicable payment standard established pursuant to [the ordinary voucher provision] for the unit, the amount of rental assistance provided on behalf of the family shall be determined using a payment standard that is equal to the rent for the dwelling unit . . . .

42 U.S.C. § 1437f(t)(1)(B). The District Court held that this provision does not impose any obligations on property owners. *See Hayes*, 186 F. Supp. 3d at 435. Instead, according to the District Court, the provision merely "authorizes and requires

the [HUD] Secretary to provide a tenant who wishes to remain in a rental housing unit additional rental assistance." *Id.* Thus, in the District Court's view, the enhanced voucher provision does not grant eligible tenants any right enforceable against their landlords—much less one that applies at the end of a lease term.

We disagree. The plain language of § 1437f(t)(1)(B)'s first clause, read in the context that it is used, does in fact provide enhanced voucher holders with a right that is enforceable against their landlords such that tenants may be evicted only for cause, even at the end of a lease term. The remainder of the provision, which is not at issue in this suit, then establishes a higher payment standard applicable when voucher holders exercise that right.

Importantly, § 1437f(t)(1)(B)'s first clause is written from the tenant's perspective, and it includes two verbs. The first is "elect," which means "to choose (a course of action) [especially] by preference." Webster's Third New International Dictionary 731 (1976). The second is "remain," meaning "to stay in the same place or with the same person or group." *Id.* at 1919. This right to "choose . . . by preference" to "stay in the same place" is not limited to any particular time period, and it is not directed to only HUD or any other specific party. Thus, the assisted family's right necessarily limits the ability of the property owner to evict. If a landlord could simply ignore an eligible family's choice to stay and force them to leave, the statutory right would be meaningless.

Likewise, the assisted family's right would be meaningless if it were not enforceable at the end of a lease term. Under such an interpretation, the first clause of § 1437f(t)(1)(B) would simply reflect the baseline conditions

17

of landlord-tenant relations: During the term of their lease, tenants generally may not be evicted, absent some reason enumerated in the lease or authorized by law; at the end of their lease term, tenants may seek to renew their leases, as long as their landlords agree to do so. Thus, if enhanced voucher holders' right to "elect to remain" limited property owners' rights during only the lease term, the first clause of the provision would have no independent meaning; it would describe what was already true. It is, however, a well-established canon of statutory interpretation that "statutes should be read to avoid making any provision 'superfluous, void, or insignificant.'" *Milner v. Dep't of the Navy*, 562 U.S. 562, 575 (2011) (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001)).

This canon is of particular importance where, as is true here, the relevant statutory text at issue was added by amendment. "When Congress amends legislation, courts must 'presume it intends [the change] to have real and substantial effect.'" *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016) (alteration in original) (quoting *Stone v. INS*, 514 U.S. 386, 397 (1995)). In this case, the original iteration of § 1437f(t)(1)(B), enacted in 1999, did not include the first clause providing that eligible families "may elect to remain." It instead provided that the higher payment standard would apply "during any period that the assisted family continues residing in the same project in which the family was residing on the date of the eligibility event for the project." Pub. L. No. 106-74, § 538(a), 113 Stat. 1047, 1122 (1999). In other words, the 1999 version of the provision did not alter the baseline conditions of landlord-tenant relations. At the end of a lease term, it stated only that HUD would provide (through the applicable PHA) any additional required financial assistance if the assisted family

18

sought to remain in the unit *and* the property owner allowed the family to do so by agreeing to renew their lease.

But the very next year, in 2000, Congress replaced the above language with the current version of § 1437f(t)(1)(B)'s first clause, stating that "the assisted family may elect to remain in the same project in which the family was residing on the date of the eligibility event." Pub. L. No. 106-246, § 2801, 114 Stat. 511, 569 (2000). Our interpretation must effectuate that change, for it simply is not plausible that Congress amended the statute within one year of its initial enactment merely to set the scene differently. By providing that eligible families "may elect to remain," Congress must have given those families some right that they did not enjoy previously— a right to choose to stay that their landlords must accept by continually renewing their leases.

According to both the Dissent and the District Court, however, the significance of the 2000 amendment is that it "obligates HUD to provide [tenants] the financial means to afford the increased rent" after their property owners opt out of the project-based program. Dissenting Op. 6; *see also Hayes*, 186 F. Supp. 3d at 435. Put differently, in the Dissent's estimation, the post-amendment version of § 1437f(t)(1)(B) provides two different protections: "[i]t not only protects against an early [lease] termination following an opt-out, but it also explicitly provides eligible enhanced-voucher tenants with a guarantee that HUD will provide them with an enhanced voucher." Dissenting Op. at 9 n.5.

The problem with this interpretation—aside from being an implausible reading of the provision's plain language—is that eligible families already had an express guarantee that HUD would provide them with enhanced vouchers. A separate

19

provision of the 1999 version of the statute already required HUD to do so.  *See* Pub. L. No. 106-74, § 531(a), 113 Stat. 1047, 1113 (1999) (amending the Multifamily Assisted Housing Reform and Affordability Act of 1997, § 524(d)) (codified as amended at 42 U.S.C. § 1437f note) ("In the case of a contract for project-based assistance under section 8 for a covered project that is not renewed . . . , upon the date of the expiration of such contract, the [HUD] Secretary shall make enhanced voucher assistance . . . available on behalf of each low-income family who, upon the date of such expiration, is residing in an assisted dwelling unit in the covered project."). With respect to the other protection identified by the Dissent, enhanced voucher families were also already shielded from "early termination following an opt-out."  Dissenting Op. at 9 n.5.  As we said above, a property owner generally may not terminate a lease and evict a tenant during the lease term, absent some reason enumerated in the lease or authorized by law.  That is the baseline condition of the landlord-tenant relationship.

Thus, neither of the Dissent's identified protections needed to be codified in 2000.  Because all of the relevant HUD obligations were covered by the 1999 version of the statute, adopting the Dissent's construction would require us to conclude that Congress amended the statute in 2000 solely to repeat what the statute and common law already required.  Such a conclusion fails to give the 2000 amendment any "real" or "substantial effect."  *Ross*, 136 S. Ct. at 1858 (quoting *Stone*, 514 U.S. at 397).

In rejecting our interpretation of the enhanced voucher provision, the District Court also expressed concern about "imposing any continued obligation on the owner to remain in the [Section 8] program" and subjecting the owner to "an

20

endless or perpetual lease." *Hayes*, 186 F. Supp. 3d. at 434–35; *see also* Dissenting Op. at 2 n.1. Examining the entire statutory scheme in context, however, makes evident that such concern is unwarranted. For one, the statute provides that enhanced vouchers cannot be transferred to "any family other than the original family on behalf of whom the voucher was provided." 42 U.S.C. § 1437f(t)(1)(C)(ii).[3] Additionally, any existing lease agreement or HAP contract will provide grounds for eviction. Indeed, leases for enhanced voucher tenancies are statutorily required to include a "good cause" eviction clause. 12 U.S.C. § 1715z-1b(b)(3). Further, regardless of whether a lease or HAP contract is in effect, the statutory provisions and regulations governing ordinary vouchers generally apply to the enhanced voucher program. *See* 42 U.S.C. § 1437f(t)(1). Thus, § 1437f(o)(7)(C), from the ordinary voucher subsection, applies and allows property owners to, at any time, terminate enhanced voucher tenancies "for serious or repeated violation of the terms and conditions of the lease, for violation of applicable Federal, State, or local law, or for other good cause."[4]

---

[3] That is not to say the right to elect to remain may be transferred among, or passed down in perpetuity to, generations of family members. Rather, as conceded by the Hayes family and confirmed by HUD, "original family" means only those family members on the lease at the time of the eligibility event. Audio of Oral Arg. at 14:39-16:30; 50:25-50:50.

[4] That § 1437f(o)(7)(C) uses the phrase "during the term of the lease" does not make the subsection's termination conditions inapplicable to enhanced voucher tenancies. Subsection (o)(7)(C) includes the "during the term of the lease"

Nothing in the enhanced voucher provision's "may elect to remain" language abrogates or forecloses application of these standards in the enhanced voucher context. Accordingly, the 2000 amendment to the provision does not reflect congressional intent to subject property owners to perpetual leases. Rather, it evidences congressional desire to strike a balance between the interests of tenants and those of property owners. On the one hand, the enhanced voucher provision permits property owners who comply with the notice provision and opt out of the project-based program to raise rents to rates that exceed the payment standard applicable to ordinary tenant- or project-based vouchers. *See* 42 U.S.C. § 1437f(t)(1)(B). On the other hand, the enhanced voucher provision places a limitation on those property owners' nonrenewal rights by requiring good cause before the owners may terminate a

---

language because ordinary, tenant-based voucher holders possess no right to elect to remain in their unit at the end of a lease term. Therefore, in the context of ordinary vouchers, the need for cause only exists "during the term of the lease." But because the enhanced voucher statute provides a right to "elect to remain," the requirements of § 1437f(o)(7)(C) apply to enhanced vouchers not only during the lease term, but also at the end of the term. This interpretation of the statutory scheme is consistent with § 1437f(t)(1), which, as previously explained, states that enhanced vouchers are governed by the ordinary voucher provision, except where modified by the enhanced voucher provision. In this context, the enhanced voucher provision modifies *when* the requirements of subsection (o)(7)(C) apply—that is, both during the term of the lease and at the end of the lease term—but it does not change the requirements themselves.

tenancy.  But for each owner, the number of tenancies to which the enhanced voucher good cause requirement applies will be fixed and relatively small, because enhanced vouchers are available to only families who were receiving project-based assistance on the date of the eligibility event, *see* 42 U.S.C. § 1437f(t)(1)(C), (t)(2).

That Congress chose to enact such a compromise is unsurprising given its purpose for creating enhanced vouchers in the first place: "allow[ing] tenants to continue to maintain their homes where the owners of their rental units have raised rents after rejecting the renewal of project-based contracts." S. Rep. No. 106-161, at 62 (1999).  Congress considered this goal "especially . . . important where the tenants [we]re elderly or persons with disabilities . . . [who] want[ed] to age in place." *Id.*  Then, when Congress amended the enhanced voucher provision in 2000, it did so in order to "clarify[] that assisted families continue to have the right to elect to remain in the same unit of their project if that project is eligible to receive enhanced vouchers."  H.R. Rep. No. 106-521, at 42–43 (2000); *see also* H.R. Rep. No. 106-710, at 164 (2000) (Conf. Report) (stating that amendment was meant to "clarify[] the intent" of the enhanced voucher provision).

These stated objectives merely confirm what the statutory text and history already make clear on their own.[5]  By

---

[5] After cautioning that "there is no need to wade into the quagmire of legislative history" here, Dissenting Op. at 10, the Dissent itself is ironically the one that pins its hopes on legislative history.  As we have explained, the plain language of § 1437f(t)(1)(B), when read in the context it is used, is alone sufficient to conclude that the District Court must be reversed. That said, it is true that "[w]hen the statutory language is

23

providing that assisted families "may elect to remain in the same project in which the family was residing on the date of the eligibility event," 42 U.S.C. § 1437f(t)(1)(B), Congress intended to grant enhanced voucher tenants a right to choose to stay in their housing developments such that their landlords

unambiguous . . . we ordinarily do not consider statutory purpose or legislative history." *Hesketh*, 828 F.3d at 167. Here, we include a brief discussion of purpose and legislative history solely to demonstrate *why* Congress would have chosen to enact this particular language—to show that this is not a case where "literal application of the statute will produce a result demonstrably at odds with the intention of its drafters." *Id.* (quoting *In re Segal*, 57 F.3d 342, 346 (3d Cir. 1995)).

The Dissent, on the other hand, leans heavily on the use of the word "clarify[]" in two committee reports—both of which we cite above—to conclude that the 2000 amendment was not meant to "substantively change" anything in the statute. Dissenting Op. at 16. Indeed, aside from those two reports, the legislative history the Dissent references relates to the 1999 statute, which we concede did not require property owners to renew the leases of enhanced voucher tenants. Thus, those two committee reports appear to form the keystone of the Dissent's contention that the 2000 amendment was intended to merely restate what the 1999 statute already required. In cases like this, however, where the statutory language is unambiguous, we require far more than a single word used in two committee reports before we depart from the general presumption that "[w]hen Congress amends legislation, . . . it intends [the change] to have real and substantial effect.'" *Ross*, 136 S. Ct. at 1858 (last alteration in original) (quoting *Stone*, 514 U.S. at 397).

24

may not evict them without cause, even at the end of a lease term. In other words, the statutory language, when read in context, is unambiguous, and it forecloses the District Court's interpretation.[6] Absent good cause, Harvey must renew the Hayes family's lease.

### 2. HUD's Interpretative Guidance and the Decisions of Other Courts

Even if the enhanced voucher statute's language were ambiguous, there would be an additional reason to reverse the District Court: through various guidance documents, HUD has

---

[6] We acknowledge that the right to elect to remain is tied, not to the particular unit, but to the "same *project* in which the family was residing on the date of the eligibility event." 42 U.S.C. § 1437f(t)(1)(B) (emphasis added). One would think, then, that at least under certain circumstances, property owners could arrange for an enhanced voucher family to move to another unit in the "same project" and still be in compliance with § 1437f(t)(1)(B). Here, however, Harvey has not expressed a willingness to permit the Hayes family to move into another one of his apartments on Pine Street, so we need not address the question, and for practical purposes of this case, the inquiry is whether Harvey may evict the family from this particular unit without cause. For the reasons we have just provided, we conclude that he may not. We note too that this case does not present the question of whether the right to elect to remain survives a downstream sale of a unit that ceases to be part of a "multifamily housing project," defined as "consist[ing] of not less than five dwelling units on one site," 24 C.F.R. § 241.500(d), because Harvey purchased three contiguous duplex houses, or six units.

long interpreted § 1437f(t)(1)(B) as requiring landlords to renew the leases of enhanced voucher holders unless there is good cause to terminate the tenancy. Because these guidance documents lack the force of law, they do not warrant deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984); they are, however, entitled to a degree of "respect" under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 298 (3d Cir. 2012) (quoting *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000)). The *Skidmore* framework is a "sliding scale" approach, *id.* at 304, which "requires a court to assign a weight to an [agency interpretation] based on 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control,'" *id.* at 295 (quoting *Skidmore*, 323 U.S. at 140). "'[T]he most important considerations are whether the agency's interpretation 'is consistent and contemporaneous with other pronouncements of the agency and whether it is reasonable given the language and purpose of the Act.'" *Id.* at 304 (quoting *Del. Dep't of Nat. Res. & Envtl. Control v. U.S. Army Corps of Eng'rs*, 685 F.3d 259, 284 (3d Cir. 2012)).

Applying *Skidmore* here, HUD's interpretation is entitled to considerable weight. As we have already explained, the interpretation that property owners must renew enhanced voucher tenancies unless there is cause to evict is a reasonable one given the language and purpose of the statute. Indeed, we think it is the only interpretation to which § 1437f(t)(1)(B) is susceptible, but if it were not, it would certainly be a reasonable construction of the provision.

26

HUD also first announced its position contemporaneously with the 2000 amendment to § 1437f(t)(1)(B). The agency's *Section 8 Renewal Policy* Guidance Document published in January 2001 provided:

> Tenants who receive an enhanced voucher have the right to remain in their units as long at [sic] the units are offered for rental housing . . . . Owners may not terminate the tenancy of a tenant who exercises this right to remain except for cause under Federal, State or local law. . . . This protection continues after the first lease term. As long as the property is offered as rental housing, absent good cause to terminate [the] tenancy under Federal, State or local law and provided the PHA continues to find the rent reasonable, owners must continually renew the lease of an enhanced voucher family.

U.S. Dep't of Hous. & Urban Dev., *Section 8 Renewal Policy: Guidance for the Renewal of Project-Based Section 8 Contracts*, § 11-3-B (Jan. 19, 2001).

In the nearly two decades since, HUD has never altered its interpretation, consistently reiterating the same view in subsequent guidance documents and notices issued to owners and PHAs. *See e.g.*, U.S. Dep't of Hous. & Urban Dev., *Section 8 Renewal Policy: Guidance for the Renewal of Project-Based Section 8 HAP Contracts*, § 11-3-B (July 28, 2017); U.S. Dep't of Hous. & Urban Dev., *Section 8 Renewal Policy: Guidance for the Renewal of Project-Based Section 8 Contracts*, § 11-3-B (Nov. 5, 2015); Memorandum from Benjamin T. Metfcalf, Deputy Assistant Sec'y for Multifamily Hous. Programs, to Multifamily Project Owners (June 5,

2014); Letter from Michael Dennis, Dir., Office of Hous. Voucher Programs, to Exec. Dirs., Public Hous. Agencies (May 22, 2014); U.S. Dep't of Hous. & Urban Dev., *Section 8 Renewal Policy: Guidance for the Renewal of Project-Based Section 8 Contracts*, § 11-3-B (Feb. 15, 2008) [hereinafter 2008 HUD Renewal Guide]. Indeed, rather than altering its position, HUD has sought to codify its interpretation through notice-and-comment rulemaking. *See* Tenant-Based Assistance: Enhanced Vouchers, 81 Fed. Reg. 74,372, 74,374–75 (Proposed Oct. 26, 2016). That proposed regulation remains pending.[7]

---

[7] Over the years, the agency has expressed the same view in court filings as well, including an amicus brief filed in this case. *See* Br. for U.S. Dep't of Hous. & Urban Dev. as Amicus Curiae at 11 ("Since § 1437f(t)(1)(B) was enacted in its current form in 2000, HUD has interpreted the provision as providing enhanced voucher tenants with a right to remain in their housing units, such that they may not be evicted at the end of a lease term absent good cause (assuming the relevant units continue to be offered as rental housing and remain otherwise eligible for rental assistance)."); *see also* Br. for the United States as Amicus Curiae at 9 & n.4, *Barrientos v. 1801-1825 Morton LLC*, 583 F.3d 1197 (9th Cir. 2009) (No. 07-56697). That amicus brief is itself entitled to respect under *Skidmore*, "to the extent [it] ha[s] the power to persuade." *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 773 n.11 (3d Cir. 2018) (quoting *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 693–94 (3d Cir. 2016)).

Furthermore, HUD's interpretation is owed considerable weight under *Skidmore* because of the agency's "specialized experience" overseeing the complex housing assistance programs, and because of "the value of uniformity" in the management of those nationally applicable programs. *De Leon-Ochoa v. Att'y Gen.*, 622 F.3d 341, 349 (3d Cir. 2010) (quoting *United States v. Mead*, 533 U.S. 218, 234–35 (2001)).

The risk of disuniformity is particularly high here, in fact, because the Ninth Circuit has already embraced HUD's position. In *Park Village Apartment Tenants Association v. Mortimer Howard Trust*, 636 F.3d 1150, 1156–57 (9th Cir. 2011), the court held that § 1437f(t)(1)(B) provides enhanced voucher holders a right to elect to remain that is exercisable against property owners, such that, "absent just cause for eviction," owners are "require[d] . . . to permit tenants to remain in the housing complex while paying only their statutorily prescribed portion of the rent." The attempted eviction in *Park Village* did not take place at the end of the lease term, so the Ninth Circuit had no need to expressly address property owners' nonrenewal rights, but nothing in the court's opinion limits § 1437f(t)(1)(B)'s application to lease terms. To the contrary, the court explicitly concluded that HUD's stance that "owners must continually renew the lease of an enhanced voucher family, absent good cause to terminate [the] tenancy," *id.* at 1157 (quoting 2008 HUD Renewal Guide) (internal quotation marks omitted), was "entitled to a measure of respect" under the *Skidmore* framework, *id.* (quoting *Barrientos v. 1801-1825 Morton LLC*, 583 F.3d 1197, 1214 (9th Cir. 2009)). Thus, if we were to reject HUD's position here and affirm the District Court, we would risk fracturing this national program.

In sum, HUD's interpretation is not entitled to outright deference, but, taking into account the most important considerations under *Skidmore*, it does warrant considerable weight. The agency's position is reasonable, longstanding, and consistent, and it was adopted contemporaneously with the relevant amendment of the statute. The agency also has unique experience managing the housing assistance programs, and another circuit has already adopted the agency's position. Thus, even if the statutory language were not sufficiently clear on its own, we would—treating HUD's view as a thumb on the scale—still reverse the District Court.

## C. The Good Cause Requirement and the Resulting Statutory Gap

Our conclusion that § 1437f(t)(1)(B) provides the Hayes family a right to elect to remain in their apartment that is enforceable against Harvey does not resolve this case. As we have explained, the statutory provisions governing ordinary vouchers generally apply to the enhanced voucher program. *See* 42 U.S.C. § 1437f(t)(1). Accordingly, § 1437f(o)(7)(C), from the ordinary voucher subsection, allows property owners to, at any time, terminate enhanced voucher tenancies "for serious or repeated violation of the terms and conditions of the lease, for violation of applicable Federal, State, or local law, or for other good cause."

Up to this point, we have yet to focus on one critical question: what constitutes "other good cause" to terminate an enhanced voucher tenancy? Unlike the previous issue regarding the "elect to remain" language, this question presents us with statutory ambiguity, for the Section 8 statute itself does not provide a definition of "other good cause." We are confronted, then, with a "statutory gap," and "[f]illing [such]

30

gaps . . . involves difficult policy choices that agencies are better equipped to make than courts." *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005); *see also Eid v. Thompson*, 740 F.3d 118, 123 (3d Cir. 2014) ("Under the familiar *Chevron* analysis . . . [i]f . . . the statute is silent or ambiguous with respect to the question at issue, we give 'controlling weight' to the agency's interpretation unless it is 'arbitrary, capricious, or manifestly contrary to the statute.'" (quoting *United States v. Geiser*, 527 F.3d 288, 292 (3d Cir. 2008)).

When it comes to ordinary tenant-based and project-based vouchers, HUD has, through regulations, filled the gap. With regard to tenant-based assistance, the agency has determined that good cause

> may include, but is not limited to, any of the following examples:
>
> (i) Failure by the family to accept the offer of a new lease or revision;
>
> (ii) A family history of disturbance of neighbors or destruction of property, or of living or housekeeping habits resulting in damage to the unit or premises;
>
> (iii) The owner's desire to use the unit for personal or family use, or for a purpose other than as a residential rental unit; or
>
> (iv) A business or economic reason for termination of the tenancy (such as sale of the

31

property, renovation of the unit, or desire to lease the unit at a higher rental).

24 C.F.R. § 982.310(d)(1).[8]   The definition applicable to ordinary project-based vouchers, while generally the same, is narrower in that good cause for those vouchers "does not include a business or economic reason or desire to use the unit for an individual, family, or non-residential rental purpose." *Id.* § 983.257(a).

HUD has not, however, promulgated a good cause regulation that governs enhanced vouchers, and it has issued no relevant guidance.  In fact, in its pending rulemaking regarding enhanced vouchers, the agency specifically requested comments on the subject.  *See* 81 Fed. Reg. at 74374–75.  To be sure, the regulatory provisions applicable to ordinary vouchers can apply to enhanced vouchers.  *See* 42 U.S.C. 1437f(t)(1).  But, as we have just explained, there are two different good cause regulations applicable to ordinary vouchers.  Neither the statute nor the regulations themselves say which, if any, of the two should apply to enhanced vouchers.

Complicating matters further is that the concept of good cause inherently requires a case-by-case inquiry.  Indeed, in issuing its good cause regulations, HUD has recognized that

---

[8] HUD's regulation governing ordinary tenant-based vouchers also provides that "[d]uring the initial lease term, the owner may not terminate the tenancy for 'other good cause', unless the owner is terminating the tenancy because of something the family did or failed to do."   24 C.F.R. § 982.310(d)(2).

"[t]he good cause concept should be flexible," and that it "should remain open to case by case determination by the courts." 60 Fed. Reg. 34,660, 34,673 (July 3, 1995) (quoting 49 Fed. Reg. 12,215, 12,233 (Mar. 29, 1984)). The agency therefore stressed that its rule provides "key 'examples' of cases that *may* be good cause, but explicitly states that 'other good cause' is not limited to the listed examples." *Id.* (emphasis added). In other words, the good cause determination is an inevitably fact-intensive inquiry, as "a comprehensive regulatory definition . . . is neither possible [n]or desirable." *Id.* (quoting 49 Fed. Reg. at 12,233).

Here, Harvey provided three different justifications for his nonrenewal of the Hayes family's lease: (1) Florence Hayes's death; (2) a plan to renovate the unit; and (3) his desire to move his daughter into the apartment. The District Court did not reach the question of whether any of these justifications were legally sufficient, because it held that Harvey did not need good cause for nonrenewal. As the good cause question may implicate critical, unresolved factual questions, summary judgment is inappropriate at this juncture, because we are unable to conclude that there is no genuine dispute as to any material fact. *See* Fed R. Civ. P. 56(a). We will therefore remand to the District Court so that it may consider in the first instance whether Harvey has good cause for nonrenewal under the circumstances of this case.

## IV. CONCLUSION

For the foregoing reasons, we will reverse the District Court's order entering judgment in favor of Harvey and remand for further proceedings consistent with this opinion.

FISHER, *dissenting.*

In the late 1990s, Congress recognized that an increasing number of owners were opting out of project-based assistance contracts, thereby putting hundreds of thousands of units of affordable housing at risk. Because HUD had repeatedly failed to address this opt-out problem, Congress passed legislation designed to compel HUD to act. Enhanced vouchers, which were a part of this legislation, offered property owners a carrot to continue renewing enhanced-voucher tenancies: market-rate rent. With its decision today, the majority takes this carrot and wields it like a stick, holding that property owners must continuously renew enhanced-voucher tenancies because such tenants supposedly have an enforceable "right to remain" in their units beyond the expiration of their lease term. Without any basis in the statutory text or history, the majority has converted Congress's incentive into an edict. This so-called "right to remain" "may be a good idea, but it was not the idea Congress enacted into law." *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 232 (1994). I respectfully dissent.

\* \* \*

Philip E. Harvey purchased 538 Pine Street free and clear of any impediments, encumbrances, liens, or restrictions. He entered into a contract with the Philadelphia Housing Authority and a related lease with the Hayes family for the four-bedroom apartment at 538B. The lease provided Harvey with sole discretion over renewal. J.A. 656 ("The Owner *may* offer the Tenant a new lease.") (emphasis added). When the lease expired, Harvey notified the family that he did not intend

1

to renew it. Under the majority's view, however, Harvey must continuously renew the Hayes family's lease for as long as they wish to remain at 538B—provided he does not have good cause to evict. This supposed "right to remain" extends to anyone who was on the lease at the time of the opt-out. As a practical matter, given that three minor children were on the lease at the time of the opt-out, Harvey's property will likely be tied up for decades.[1] If Congress meant to create such a "right to remain," it would have done so clearly. Because it did not, and because this Court is not a legislature, I disagree with the majority's holding.

This case turns on the meaning of four words—"may elect to remain"—added to 42 U.S.C. § 1437f(t)(1)(B) in 2000. Military Construction Appropriations Act, 2001, Pub. L. 106-246 § 2801, 114 Stat. 511 (2000). From these four words, the majority infers an entirely new "right to remain" for enhanced-voucher tenants, enforceable against their landlords. The majority's reasoning is flawed on several fronts. It largely analyzes these four words in isolation, rather than in their proper context; it mistakenly construes the provision as being directed at property owners, when it is actually directed at the relationship between HUD and assisted tenants; and it ignores the fact that if Congress meant to so expansively alter property

---

[1] I acknowledge that this is not a "perpetual lease" in the sense that it can be terminated in limited instances. And I acknowledge that the only family eligible for the enhanced voucher is the family who was on the lease at the time of the opt-out. Still, the majority has, in essence, conferred on the Hayes family a life estate at 538B Pine Street—notably, one that extends multiple generations. In other words, the majority has tied up Harvey's property for however many years—or decades—the Hayes family chooses to reside there.

law, it would have done so clearly. It also overlooks the basic design of the enhanced voucher program as an incentive-based program, not a compulsory one.

## I. Statutory text

Like the majority, I begin with the statute's text. *Rosenberg v. XM Ventures*, 274 F.3d 137, 141 (3d Cir. 2001). If the "language is plain and unambiguous, further inquiry is not required." *Id.* In determining whether the language is "plain and unambiguous," we examine "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* (quoting *Marshak v. Treadwell*, 240 F.3d 184, 192 (3d Cir. 2001)). A proper reading of the statute reveals that it is directed not at property owners, but at HUD and assisted tenants, and that the program was designed to incentivize—rather than compel—owners to renew enhanced-voucher tenancies.

The "may elect to remain" language at issue was added to § 1437f(t)(1)(B) in 2000 via amendment.[2] The current provision states that

> *the assisted family may elect to remain in the same project in which the family was residing on the date of the eligibility event for the project, and if, during any*

[2] That this key language was buried within a "Military Construction Appropriations Act," without any explanation, is perhaps another clue that Congress did not intend to create a new substantive right that would force property owners to continuously renew enhanced-voucher tenancies.

> *period the family makes such an election and continues to so reside*, the rent for the dwelling unit of the family in such project exceeds the applicable payment standard . . . , the amount of rental assistance provided on behalf of the family shall be determined using a payment standard that is equal to the rent for the dwelling unit (as such rent may be increased from time-to-time), subject to paragraph 10(A) of subsection (o) of this section and any other reasonable limit prescribed by the [HUD] Secretary, except that a limit shall not be considered reasonable for purposes of this subparagraph if it adversely affects such assisted families . . . .

42 U.S.C. § 1437f(t)(1)(B) (emphasis added).

The majority bases its sweeping view of the enhanced voucher statute on these four words—"may elect to remain"—which it largely reads in isolation. Indeed, despite repeatedly acknowledging that a statute must be examined in context, the majority never attempts to examine the key four words within the context of the enhanced voucher provision, let alone the "broader context of the statute as a whole." *Rosenberg*, 274 F.3d at 141 (quoting *Marshak*, 240 F.3d at 192). By failing to read these words in context, the majority incorrectly determines that this provision is somehow directed at property owners. Then, based on this incorrect premise, the majority infers a "right to remain" because if an assisted family "may

4

elect to remain," then that must impose a corresponding obligation on property owners to continuously renew an enhanced-voucher tenancy. There is no basis in the text to support this inferential leap.

The language—"the assisted family may elect to remain"—does not plainly restrict a property owner's nonrenewal rights. Indeed, nothing in the clause, nor the entire subsection, even mentions property owners. As the majority notes, there are two key verbs: "elect" and "remain." "Elect" means "to make a selection of . . . to choose . . . especially by preference." *Elect*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/elect (last visited July 31, 2018). "Remain" means "to stay in the same place or with the same person or group." *Remain*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/remain (last visited July 25, 2018). Thus, what this clause plainly states is that an assisted tenant can "make a selection" or "choose" to "stay in the same place." But for how long? One year? Five years? For life? Choosing to stay is plainly different than having a right or entitlement to stay. The majority, however, conflates the two and infers a corresponding obligation on property owners.

When viewing the language first in the proper context of § 1437f(t)(1)(B), it is evident that "may elect to remain" has nothing to do with property owners, but is rather directed at HUD and assisted tenants. The provision explains what tenants must do to maintain eligibility, and that a tenant's "elect[ion] to remain" is the triggering mechanism that initiates HUD's obligation under the provision. It works as follows. After a valid opt-out, an assisted family can "elect to remain" in the same project. If the post-opt-out rent exceeds the payment standard, then the assisted family's rent is calculated as specified by the statute. But how can the assisted family be

5

*assured* that HUD will provide them with an enhanced voucher to afford the increased rent?[3] Enter § 1437f(t)(1)(B), which obligates HUD to provide the financial means to afford the increased rent. In other words, it makes their election to remain meaningful.[4] This is the key feature of the enhanced voucher program—namely that HUD is required to provide an enhanced voucher to an eligible tenant, once they "elect to remain."

What this provision does not do is impose a duty on a landlord to continuously renew such a lease beyond its natural expiration date. The majority infers such a duty, reasoning that

---

[3] As discussed in Part II, *infra*, there is ample evidence suggesting that Congress was concerned with HUD's failure to act despite the threat of increasing opt-outs. Thus, it enacted these provisions to compel HUD to act—not to compel property owners.

[4] As the panel stated before the grant of rehearing en banc:

> In our view, through the 2000 amendment Congress intended to make clear that, following a valid opt-out, HUD could not force an assisted family to leave the unit *and* that the family's enhanced vouchers must be credited toward their rental obligations. . . . But after a rental agreement naturally expires, so too do the attendant rental obligations. At that point, the statute goes silent. Nothing in its text explicitly or impliedly obligates property owners to continuously renew enhanced-voucher tenancies.

*Hayes v. Harvey*, 874 F.3d 98, 106 n.3 (3d Cir.), *reh'g en banc granted, judgment vacated*, 878 F.3d 446 (3d Cir. 2017).

6

otherwise, the family's choice under the statute would be meaningless. Under the majority's novel reasoning, a "right" is "meaningless" unless it makes the right-holder's objective not only possible, but perfectly assured. It follows, I suppose, that if a foundation guarantees a full college scholarship to a high school student, this is "meaningless" because no college is required to offer the student admission. Nonsense. When there are multiple parties involved in a transaction, a guarantee to one party is not meaningless, in any sense, even if it does not bind all parties. The right conferred in § 1437f(t)(1)(B) is the right to have HUD increase the level of assistance to match the market-rate rent set by the now-opted-out property owner. And this is far from a token assurance—without the enhanced voucher program, tenants like the Hayes family often would be unable to afford market-rate rent following an opt-out.

The majority also fails to view the language in the context of the entire statute. If Congress meant to direct any part of the enhanced voucher statute at property owners, it would have done so in unambiguous terms, as it does elsewhere. *See* 42 U.S.C. § 1437f(o)(7)(B) ("owner shall offer leases to tenants under this subsection"); § 1437f(o)(7)(C) ("owner shall not terminate"); § 1437f(o)(13)(G) ("may obligate the owner"); § 1437f(o)(13)(J) ("The owner . . . shall not admit any family to a dwelling . . . other than a family referred by the public housing agency from its waiting list."); § 1437f(cc)(2)(B) ("require the owner to submit an application for those rent requirements"). So within the context of the overall statute, it is evident that § 1437f(t)(1)(B) has nothing to do with property owners.

Read in context, these four words—"may elect to remain"—simply cannot bear the weight the majority heaps upon them. As the Supreme Court has noted, Congress "does not alter the fundamental details of a regulatory scheme in

7

vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001). Creating a new, enforceable "right to remain," however, would certainly be an alteration of a "fundamental detail[] of [this] regulatory scheme"—an elephant hiding in a mousehole. *Id.*

The question then becomes: what does "may elect to remain" mean? After all, it must mean something, given that a "statute should be construed to give effect to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)). Likewise, "[w]hen Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Stone v. INS*, 514 U.S. 386, 397 (1995). The answer is that the language provides enhanced-voucher recipients with a guarantee that they will not be evicted, during their lease term, by a landlord who refuses to accept enhanced vouchers as part of their rental payment. As the Ninth Circuit explained:

> The statute gives "assisted families" the right "to remain in the same project." The statute also authorizes owners to raise their rents to a reasonable market rate and to receive a housing assistance payment, by means of an enhanced voucher, to cover the authorized increases in rent. It does not authorize owners to raise their rents to a reasonable market rate, but then to refuse to accept payment by means of an enhanced voucher, and evict an "assisted family" for nonpayment of rent. Practically, the statute requires owners to permit tenants to remain in the housing complex while paying only their statutorily prescribed portion of the rent.

8

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1156 (9th Cir. 2011); *see also Feemster v. BSA L.P.*, 548 F.3d 1063, 1069 (D.C. Cir. 2008) ("One thing that [the landlord] may not do, however, is refuse to accept payment by voucher and then contend that eviction is warranted for nonpayment of rent."). This is a consequential protection; it does not render the language superfluous or meaningless.[5] This protection cannot, however, extend in perpetuity beyond the contractual relationship between the landlord and the assisted tenant.

Given that nothing in the enhanced voucher statute speaks to nonrenewal, we must look to the ordinary voucher's termination provision, which provides that "*during the term of the lease*, the owner shall not terminate the tenancy except for

---

[5] Nor does this merely "reflect the baseline conditions of landlord-tenant relations." Maj. Op. at 17–18. It not only protects against an early termination following an opt-out, but it also explicitly provides eligible enhanced-voucher tenants with a guarantee that HUD will provide them with an enhanced voucher. The majority finds my reading "implausible" because the 1999 version of the statute contained a similar provision. But in its single-minded quest to give the 2000 amendment "independent meaning," the majority ignores everything else—the plain language of the text, the context in which the language is used, the broader context of the overall statute, and the fact that Congress does not alter fundamental details of a regulatory scheme in vague terms. Indeed, had Congress meant to radically alter property rights in the way my colleagues do today, it would have done so clearly. What is "implausible," then, is the inferential leap the majority must take to arrive at its conclusion.

serious or repeated violation of the terms and conditions of the lease, for violation of applicable Federal, State, or local law, or for other good cause." 42 U.S.C. § 1437f(o)(7)(C) (emphasis added). Under the plain language of this provision, Harvey's termination rights were limited "during the term of the [Hayes family's] lease." *Id.* After the lease term expires, so do these protections. Of course, Harvey had an incentive to renew the Hayes family's lease, given that he was receiving market-rate rent. And, indeed, he did renew the lease multiple times. But nothing compels him to do so continuously.

## II. Statutory history

The foregoing analysis of the statutory text is sufficient to conclude that there is no "right to remain" beyond the expiration of the initial lease term. Thus, there is no need to wade into the quagmire of legislative history.[6] The majority

_____

[6] The majority suggests that I "pin[ my] hopes on legislative history." Maj. Op. at 23 n.5. I do not; the plain language of the statute is sufficient to affirm the District Court. Indeed, where—as here—the statutory text is unambiguous, there is generally no need to consider statutory purpose or legislative history. *Doe v. Hesketh*, 828 F.3d 159, 167 (3d Cir. 2016). Further inquiry is warranted only in "rare circumstances" where a "literal application of the statute will produce a result demonstrably at odds with the intentions of its drafters . . . or where the result would be so bizarre that Congress could not have intended it." *Id.* (quoting *In re Segal*, 57 F.3d 342, 346 (3d Cir. 1995)). I agree with the majority that this is not such a "rare circumstance[]." *Id.* But the majority's reading of the statute results in such an outcome—one that is "so bizarre that Congress could not have intended it." *Id.* The

10

does, however, and its analysis reflects some of the common pitfalls associated with such an undertaking. I examine the legislative history to highlight those errors, and to show that the history is not only consonant with our interpretation of the statute—it compels it.

Legislative history can sometimes be a useful tool, but it must be deployed with care. *Compare Digital Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 783 (2018) (Thomas, J., concurring in part and concurring in the judgment) (noting that the Court's attempt to derive a supposed "purpose" from a single Senate Report is flawed, because "[e]ven assuming a majority of Congress read the Senate Report" and "agreed with it," we must still look at what was actually enacted because "we are a government of laws, not of men"), *with id.* at 782–83 (Sotomayor, J., concurring) (noting that legislative history can "aid us in our understanding of a law" and that "even when . . . a statute's meaning can clearly be discerned from its text, consulting reliable legislative history can still be useful, as it enables us to corroborate and fortify our understanding of the text").

The point of contention here is the same as in *Digital Realty Trust*: selective quotation of a limited number of legislative reports to divine Congressional intent, while ignoring more compelling evidence. *See* Maj. Op. at 23 (citing S. Rep. No. 106-161 (1999), and H.R. Rep. No. 106-521 (2000)). In focusing on these reports, the majority overlooks the overall purpose behind the enhanced voucher provision, and the means by which Congress sought to achieve that purpose. A proper analysis of the statutory history reveals two key points: first, that the enhanced voucher provisions are

legislative history discussed in this section merely reinforces this notion.

11

clearly directed at HUD—not property owners—because of HUD's repeated failure to confront the impending opt-out problem; and second, that Congress intended the enhanced voucher provision to act as a market-based tool to incentivize—not force—property owners to renew leases of enhanced voucher holders.

At the outset, I note where I agree with the majority. I agree that one of the main purposes of the enhanced voucher provision was to "allow tenants to continue to maintain their homes where the owners of their rental units have raised rents after rejecting the renewal of project-based contracts." S. Rep. No. 106-161, at 62 (1999); Maj. Op. at 23. I also agree that this goal "especially is important where the tenants are elderly or persons with disabilities, and want to age in place." S. Rep. No. 106-161, at 62 (1999). I further acknowledge that the opt-out problem was a real one—reliable studies showed that 500,000 units of affordable housing could have been at risk in the following years due to increasing opt-outs. 145 Cong. Rec. 22850 (Majority Staff, *Marking up to Market: Renewing Section 8 Contracts and the Problem of Owner "Opt Outs,"* June 23, 1999). Likewise, I agree that the enhanced voucher provision shows that Congress wanted to strike a balance between tenants' and landlords' interests. The problem, which the statutory history reveals, is that the majority strikes a balance that Congress clearly did not.

Although the majority correctly notes Congressional desire to allow tenants to maintain their homes, it wholly ignores another major factor prompting the legislation; Congress was concerned with HUD's inaction regarding the looming threat of increasing opt-outs. Section 8 Housing: Hearing Before the Sen. Subcomm. on Hous. and Transp., 106th Cong. (1999), 1999 WL 492964 (written testimony of Rep. Rick Lazio, Chairman, H. Subcomm. Hous. & Cmty.)

12

(explaining that "Congress must act," because "[f]or the last 18 months, HUD has had broad authority to prevent opt-outs and the loss of affordable housing," but has failed to act); 145 Cong. Rec. 22850 (majority Staff, *Marking up to Market: Renewing Section 8 Contracts and the Problem of Owner "Opt Outs*," June 23, 1999) (noting that "HUD has failed to offer or develop anything resembling a comprehensive approach to solving the opt-out problem," and that "many in the advocacy community and some legislators expressed belief that encouraging nonrenewals was an intentional policy choice [by HUD]."). Indeed, even the Senate Report the majority cites reveals that, in order to achieve the stated goal of allowing assisted tenants to remain in their homes, Congress was authorizing *HUD* to act, as opposed to imposing any obligation on landlords. S. Rep. No. 106-161, 62 ("[a]uthoriz[ing] HUD to provide . . . enhanced vouchers" for this purpose, and instructing "HUD [to] make every effort to renew expiring section 8 project-based contracts before making [enhanced] vouchers available"). All of this further suggests that the majority's reading of 42 U.S.C. § 1437f(t)(1)(B) is based on an incorrect premise—that it somehow is directed at the landlord-tenant relationship. On the contrary, this history makes clear (as does the statute itself) that the enhanced voucher provision is directed at the relationship between HUD and assisted tenants.

Next, although the enhanced voucher provision reflects congressional intent to strike a balance between landlords' and tenants' interests, the majority imposes a far different balance. Specifically, nothing in the legislative history suggests that Congress ever meant to force owners, like Harvey, to continuously renew enhanced-voucher tenancies, absent good cause to end the lease. Rather, the enhanced voucher program was clearly designed as a *market-based solution* that would

13

incentivize and encourage owners to continue renewing enhanced-voucher tenancies. *See* 145 Cong. Rec. 22848 (statement of Rep. Rick Lazio, Chairman, H. Subcomm. Hous. and Cmty.) ("[W]hat we have done with this bill is . . . *create the right incentive for owners* to ensure the continuity of allowing the seniors, the disabled . . . to continue to live . . . there.") (emphasis added)[7]; *id.* (statement of Rep. Barney Frank) ("[O]wners ought not to drop out. No one can say I am driven economically to drop out. . . . No one is going to be asked to lose money by staying in the program. *We cannot take away their legal right to get out; we can diminish their financial incentive to get out.*") (emphasis added).

Numerous contemporaneous statements corroborate this view of the Section 8 enhanced voucher program. HUD Section 8 opt-out crisis: Hearing before the Subcommittee on Housing and Transportation of the Committee on Banking, Housing, and Urban Affairs, 106th Cong. (July 1, 1999), 1999 WL 492966 (testimony of Sen. John Kerry) ("[T]he new HUD policy largely meets the concerns of the owners of section 8 housing. Now, I *ask these owners to hold up their side of the bargain and agree to accept the new, higher rents and stay in the program.* I understand that it can be difficult at times to work with HUD. Still, the Department has come far, far more

---

[7] These statements were made in support of H.R. 202, portions of which were incorporated into H.R. 2684, which become Public Law No. 106–74, the 1999 version of the enhanced voucher statute. *See* H.R. Rep. No. 106–379, at 169 (1999) ("Title V combines certain provisions from . . . H.R. 202. . . ."). Rep. Lazio's statements, in particular, have been cited by several courts, including this one. *See, e.g.*, *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1163–64 (9th Cir. 2011).

14

than half way. We should expect the owners to take the last step and continue in the program.") (emphasis added); *see also id.* (testimony of William C. Apgar, Assistant Sec. HUD), 1999 WL 492965 ("HUD's multifamily subsidies were always intended as market-driven programs dependent on the private sector to provide affordable housing.").

In other words, Congress identified a problem: HUD's failure to act despite the threat of impending opt-outs. To combat this problem, Congress enacted a solution: compelling HUD to make up the difference between what assisted families could pay and market-rate rents. This solution struck the appropriate balance between tenants' interests and landlords' interests. This balance, however, never included forcing landlords to continuously renew enhanced-voucher tenancies after the leases expired on their own terms. Rather, the balance was that Congress would compel HUD to provide enhanced vouchers to eligible tenants; this, in turn, provided property owners with the proper incentive—market-rate rent—to continue renewing enhanced-voucher tenancies. Of course, if a property owner decided not to renew an enhanced-voucher tenancy, then nothing in the statute could, or would, require him to do so. After all, an incentive is not an edict.

Admittedly, much of the foregoing discussion pertains to the earlier version of the enhanced voucher statute. But that context is critical, especially given the complete dearth of information regarding the 2000 amendment. Indeed, the only explanation provided for the insertion of the "may elect to remain" language at issue here is that it was added to "*clarify*[] that assisted families continue to have the right to elect to remain in the same unit of their project if that project is eligible to receive enhanced vouchers." H.R. Rep. No. 106-521, 42–43 (2000) (emphasis added); *see also* H.R. Rep. No. 106-710, at 164 (2000) (Conf. Report) (noting that the amendment was

15

intended to "clarif[y] the intent" of the enhanced voucher provision).

This reveals another major flaw in the majority's reasoning. Clarify, after all, means "to make understandable," or "to free of confusion." *Clarify*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/clarify (last visited July 25, 2018). Thus, according to the legislative history the majority relies on, the purpose of the 2000 amendment was simply to make the 1999 version "understandable"—not to substantively change it.[8] Undoubtedly, the creation of an entirely novel, judicially enforceable "right to remain," which radically alters property rights, is a substantive change. Deriving this right entirely from the 2000 amendment, as the majority does, cannot be correct.

## III. Other considerations

The majority suggests that HUD's interpretive guidance, as well as the decisions of other courts, provide further support for its conclusions. I disagree.

Through policy guidance, HUD has purported to extend § 1437f(o)(7)(C)'s midterm limitations to nonrenewals of enhanced-voucher tenancies. *See, e.g.*, HUD Section 8 Renewal Policy, Ch. 11, ¶ 11-3(B) (2017) (stating that "[o]wners may not terminate the tenancy of a tenant who

---

[8] There is a meaningful difference between a clarification and a substantive change. *See Napotnik v. Equibank & Parkvale Sav. Ass'n*, 679 F.2d 316, 321 (3d Cir. 1982). Of course, "we are constrained to give effect to the statutory language actually enacted." *Id.*

exercises this right to remain except for cause" and that "[o]wners must continually renew the lease of an enhanced voucher family"). As the majority correctly notes, these documents lack the force of law, and are therefore not accorded deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Rather, they are entitled to a "degree of respect" under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), but only to the extent that HUD's interpretation has the "power to persuade." *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000) (quoting *Skidmore*, 323 U.S. at 140). I am not persuaded.

Some of the "most important considerations are whether the agency's interpretation 'is consistent and contemporaneous with other pronouncements of the agency.'" *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 298 (3d Cir. 2012) (quoting *Del. Dep't of Nat. Res. & Envtl. Control v. U.S. Army Corps of Eng'rs*, 685 F.3d 259, 284 (3d Cir. 2012)). Admittedly, HUD's policy guidance was first issued contemporaneously with the 2000 amendment and has been consistent. In addition, HUD has "relative expertise," *id.* at 305, in administering the statutory scheme. But expertise and consistency do not alone require deference. We must also consider whether HUD's interpretation "is reasonable given the language and purpose of the [statute]," *id*. at 304, "the thoroughness evident in [HUD's] consideration, the validity of its reasoning . . . and all those factors that give it the power to persuade, if lacking the power to control." *Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1352 (2015) (quoting *Skidmore*, 323 U.S. at 140). Here, HUD's statement that "[o]wners must continually renew the lease of an enhanced voucher tenancy," is contained in one paragraph of HUD's nearly 200-page Section 8 Renewal Guidebook. HUD Section 8 Renewal Policy, Ch. 11, ¶ 11-3(B) (2017). Nowhere in this guidance does HUD explain the

reasoning behind its interpretation, and therefore we cannot discern the thoroughness of its consideration, nor the "validity of its reasoning." *Young*, 135 S. Ct at 1352 (quoting *Skidmore*, 323 U.S. at 140). And, most importantly, HUD's interpretation is not supported by the statute's text and history. Accordingly, HUD's interpretation lacks "the power to persuade." *Id.*

Decisions of other courts do not alter this conclusion. I acknowledge that, in the framework of non-binding *Skidmore* deference, HUD's interpretation may be entitled to some degree of deference given the "value of uniformity." *United States v. Mead Corp.*, 533 U.S. 218, 234 (2001) (citing *Skidmore*, 323 U.S. at 140). Contrary to the majority's view, however, there is no uniformity problem here. In fact, no other Court of Appeals has weighed in on the issue of non-renewal after the expiration of a lease term. Instead, our sister Circuits' decisions have only addressed situations where a landlord sought to evict an enhanced-voucher tenant during the lease term for nonpayment reasons. *See Park Vill.*, 636 F.3d at 1156 ("[The statute] does not authorize owners to raise their rents to a reasonable market rate, but then to refuse to accept payment by means of an enhanced voucher, and evict an 'assisted family' for nonpayment of rent."); *Feemster*, 548 F.3d at 1069 ("One thing that [the landlord] may not do, however, is refuse to accept payment by voucher and then contend that eviction is warranted for nonpayment of rent."). I agree with *Park Village* and *Feemster* insofar as they address the actual issues before those courts. In other words, there is no risk of non-uniformity, nor is there the potential for a circuit split.

## IV. Conclusion

18

The proper role of the judiciary is to "apply, not amend, the work of the People's representatives." *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1726 (2017). Today, the majority oversteps that role by crafting an enforceable "right to remain" that finds no support in the statutory text or history. I respectfully dissent.